Raymond P.L. CANNEFAX and Debra Cannefax, Plaintiffs and Appellants,

v.

Donald W. CLEMENT and Ruth L. Clement, Defendants and Respondents.

No. 890292–CA.

Court of Appeals of Utah.

Feb. 2, 1990.

---

Rodney M. Pipella (argued), Salt Lake City, for plaintiffs and appellants.

Steven H. Lybbert (argued), Salt Lake City, for defendants and respondents.

Before BILLINGS, JACKSON and BULLOCK [1], JJ.

## OPINION

BILLINGS, Judge:

Raymond and Debra Cannefax ("Cannefaxes") appeal a summary judgment en-tered against them in their quiet title action and in favor of Donald and Ruth Clement ("Clements"). In granting summary judgment, the court held that a seller's retained legal title to real property under an executory land sale contract was "real property" and, therefore, that a judgment docketed by the Clements, the seller's creditors, was a lien against the property pursuant to Utah Code Ann. § 78–22–1 (1987). We reverse.

George W. Barker, Jr. and Lila M. Barker ("Barkers") were fee simple owners of the Lockhart Road Property at issue in this quiet title action. In 1981, the Barkers entered into a uniform real estate contract to sell their property to Diane Hodge ("Ms. Hodge") for $160,000. Ms. Hodge paid $40,000 to the Barkers at the time of the sale and she was to pay the balance over the contract term. On August 31, 1981, Ms. Hodge recorded a notice of her uniform real estate contract.

Four years later, the Clements obtained a judgment against the Barkers for $70,526 which was docketed in August 1985. The stipulated facts show no attempt by the Clements to execute against the Barkers' retained interest in the Lockhart Road Property nor any attempt to garnish the proceeds Ms. Hodge paid to the Barkers during the executory period of the uniform real estate contract.

On September 25, 1985, Ms. Hodge paid the remaining amount due under her uniform real estate contract with the Barkers, satisfied prior obligations on the Lockhart Road Property, and the Barkers deeded the property to her. At the same meeting, Ms. Hodge sold the property to the Cannefaxes and gave them a warranty deed to the Lockhart Road Property. After the dual closings were completed, Surety Title conducted a title search which disclosed the Clements' judgment docketed against the Barkers. This is the first mention in the stipulated facts of any actual knowledge of the Clements' judgment.

---

1. J. Robert Bullock, Senior District Judge, sitting by special appointment pursuant to Utah Code Ann. § 78–3–24(10) (1989).

Subsequently, the Clements obtained a writ of execution against the Lockhart Road Property then owned in fee simple by the Cannefaxes. In response, the Cannefaxes brought this quiet title action.

The trial court granted summary judgment in favor of the Clements, holding their judgment was a lien on the Lockhart Road Property to the extent of $54,464.94, the amount which remained unpaid on the uniform real estate contract between their judgment debtors, the Barkers, and Ms. Hodge on September 25, 1985, the date the Barkers deeded Ms. Hodge the property.

■ We find the trial court's ruling contrary to the doctrine of equitable conversion which is the law in Utah. Under the doctrine of equitable conversion, once parties have entered into a binding and enforceable land sale contract, the buyer's interest in the contract is said to be real property and the seller's retained interest is characterized as personal property. R. Cunningham, W. Stoebuck, & D. Whitman, The Law of Property § 10.13, at 698 (1984). The rights of the parties are evaluated as if the conveyance had been made. H. McClintock, McClintock on Equity § 106, at 284 (1948) [hereinafter "McClintock on Equity"].

The Utah Supreme Court first adopted the doctrine of equitable conversion in *Allred v. Allred*, 15 Utah 2d 396, 393 P.2d 791 (1964). The court characterized the seller's interest under a land sale contract as personalty, stating, "[a]s a general rule an enforceable executory contract of sale has the effect of converting the interest of the vendor of real property to personalty." 393 P.2d at 792. Again in *In re Estate of Willson*, 28 Utah 2d 197, 499 P.2d 1298 (1972), the court clearly held that the interest of a seller under a land sale contract

was personal property, not real property, for inheritance tax purposes. 499 P.2d at 1300–01.

The court applied the doctrine of equitable conversion in a condemnation context in *Jelco v. Third Judicial Dist. Court*, 29 Utah 2d 472, 511 P.2d 739 (1973). In *Jelco*, both the buyer and the seller under an executory land sale contract claimed a right to the increase in value of the land which had been condemned. The court held the buyer was the owner of the land, and thus he was entitled to the condemnation proceeds. 511 P.2d at 741. In describing the status of the vendor under the contract the court stated, "the vendor ... has only legal title. In regard to the purchase price, what he is entitled to is to have it paid in accordance with the terms of the contract." *Id.* See also *Bill Nay & Sons Excavating v. Neeley Constr. Co.*, 677 P.2d 1120, 1121 (Utah 1984) ("The interest of a purchaser under a real estate contract is an interest in real property....").

Contrary to the claims made by the dissent, the Utah Supreme Court has consistently applied the doctrine of equitable conversion characterizing the seller's interest under an executory land sale contract as personal property and the buyer's interest as real property.[2]

The Utah Supreme Court recently applied the doctrine of equitable conversion in determining the rights of judgment creditors under an executory land sale contract in *Butler v. Wilkinson*, 740 P.2d 1244 (Utah 1987). In *Butler*, the court squarely held that the buyer's interest under the executory land sale contract was an interest in real property to which judgment liens could attach. Justice Stewart stated: "The doctrine of equitable conversion characterizes the seller's interest as an interest in personalty and not as one in realty, where-

**2.** The dissent ignores the previous precedent, and rather relies upon its interpretation of *Reynolds v. Van Wagoner*, 592 P.2d 593 (Utah 1979), claiming the Utah court chose not to apply the doctrine of equitable conversion in this case because "it would have led to an inequitable result inconsistent with the contractual intent of the parties." We disagree with the dissent's reading of this case. The Utah Supreme Court in *Reynolds* did not utilize the doctrine of equitable conversion because the case focused on abandonment of contractual rights not equitable conversion. *Id.* at 594.

as the vendee's interest under the executory contract is deemed an interest in realty." *Id.* at 1255. Further clarifying the doctrine of equitable conversion as it affects judgment creditors, he continued:

> Under the doctrine of equitable conversion, a vendee under a uniform real estate contract obtains an equitable interest in the land itself, even though the vendor retains the legal title. The vendee is said to convert the monetary interest that he has in the property to an interest in real estate so that he may invoke the powers of an equity court to compel specific performance of the real estate contract. *By a parity of reasoning, the vendor under such a contract is deemed to have converted his interest in the land that is the subject of the contract to a monetary or legal interest*
> . . . .

*Id.* at n. 5 (emphasis added). The court further detailed the nature of the interest retained by the seller under a land sale contract, stating:

> Under an installment land sale contract, *the vendor retains legal title as security for the purchase price of the property.* Oaks v. Kendall, 23 Cal. App.2d 715, 73 P.2d 1255 (1937); *Marks v. City of Tucumcari*, 93 N.M. 4, 595 P.2d 1199 (1979). Nevertheless, as a general proposition, the vendee is treated as the owner of the land. . . .
>
> . . . .
>
> *The vendor's interest is similar to the security interest of a purchase money mortgagee.*

*Id.* at 1254–55 (emphasis added).

The supreme court in *Butler* concluded the buyer under a binding executory land sale contract has an interest in real property to which judgment liens may attach as to any other real property interest but subject to the seller's prior lien. "By a parity of reasoning," the court concluded that the seller's interest under the contract is merely the right to receive the proceeds under the contract secured by his retained legal title similar to the "security interest of a purchase money mortgagee." *Id.* at 1255.

In *Butler*, Justice Stewart relied upon *Marks v. City of Tucumcari*, 93 N.M. 4, 595 P.2d 1199 (1979). In *Marks*, the New Mexico court applied the doctrine of equitable conversion and held that the interest retained by the vendor under a land sale contract is personalty and not real estate, and thus that a judgment docketed by a creditor of the seller during the executory period of the contract had no effect on the interest of a subsequent purchaser of the property. 595 P.2d 1201–02.

■ The dissent claims *Butler* supports its holding that a judgment lien docketed against the seller's interest under a uniform real estate contract survives as a lien against the land even though all proceeds have previously been paid to the judgment debtor-seller under the contract and the property has been deeded to a subsequent purchaser for value. We disagree. The dissent relies on the following language from *Butler:* "[the seller has] a contract right to ... take back the vendee's interests if the vendee defaults. The vendor also has an interest ... measured by the amount the vendee owes under the contract." *Butler*, 740 P.2d at 1255 (citation omitted). This language is consistent with our view of the nature of the seller's retained interest, not the dissent's. The seller has retained legal title as security to insure that he or she receives the payments due under the contract; if the buyer should default, the seller's title will not be released to the buyer. This is the extent of the seller's retained interest—which, under the doctrine of equitable conversion, is not in the nature of real property such that liens can attach under section 78–22–1.

This court's recent decision in *Lach v. Deseret Bank*, 746 P.2d 802 (Utah Ct.App. 1987), adopts our reading of *Butler*. In dicta, this court concluded that a judgment lien docketed against a seller's interest under a uniform real estate contract did not affect the rights of the buyer under that contract. *Id.* at 805. Our language that "no judgment lien can be created by a judgment docketed against a seller after

the seller executes a binding earnest money contract," *id.*, however, needs amplification. The docketed judgment does not become a lien under the statute because the seller's retained legal title is not real property.

We believe Utah authority supports the following analysis of this case. The Barkers entered into a uniform real estate contract to sell the Lockhart Road Property to Ms. Hodge before the Clements docketed their judgment. Under the doctrine of equitable conversion, the Barkers retained only bare legal title to the property as security to receive the payment of the proceeds due from Ms. Hodge under the contract. Thus, the Clements' docketed judgment did not create a judgment lien against the Lockhart Road Property.

The three jurisdictions relied upon by the dissent, Nebraska, Idaho and Oregon, have held that a judgment creditor of a contract seller will be given a lien in the property to the extent of the unpaid amounts due under the contract. *Monroe v. Lincoln City Employees Credit Union*, 203 Neb. 702, 279 N.W.2d 866, 868 (1979); *First Sec. Bank v. Rogers*, 91 Idaho 654, 429 P.2d 386, 389 (1967); *Heider v. Dietz*, 234 Or. 105, 380 P.2d 619, 624 (1963) (en banc). This rule has been qualified, however, to allow a purchaser to continue to make payments pursuant to his contract until he is given actual notice of the judgment lien. The buyer is not required to search the records before he makes his payments under the contract. Lacy, *Creditors of Land Contract Vendors*, 24 Case W.Res.L.Rev. 645, 647 (1973) [hereinafter "Lacy, 24 Case W.Res.L.Rev. 645"]; Simpson, *Legislative Changes in the Law of Equitable Conversion by Contract*, 44 Yale L.J. 559, 578 (1935) [hereinafter "Simpson, 44 Yale L.J. 559"]. Furthermore, any lien acquired by the judgment creditor is "discharged by payment of the balance of the purchase money due although less than the amount of the judgment." *Id.; see also* 3 Am.Law Real Property § 11.29, at 86 (A. Casner ed. 1952) [hereinafter "3 Am.Law Real Property"].

Thus, not even the "rule" relied upon by the dissent supports its position. There are no facts in the record to support a finding that Ms. Hodge had actual notice of the Clements' judgment before she paid all proceeds due the Barkers as sellers under the contract.

Furthermore, the rule relied upon by the dissent is not the majority rule, nor the rule in Utah. The following jurisdictions have held that a judgment lien against the seller's interest is not an encumbrance on the buyer's property interest under a land sale contract: *Marks v. City of Tucumcari*, 93 N.M. 4, 595 P.2d 1199, 1202 (1979); *Mueller v. Novelty Dye Works*, 273 Wis. 501, 78 N.W.2d 881, 884 (1956); *Stecker v. Snyder*, 118 Colo. 153, 193 P.2d 881, 884 (1948); *Snow Bros. Hardware Co. v. Ellis*, 180 Ark. 238, 21 S.W.2d 162, 163 (1929); *see also* Simpson, 44 Yale L.J. 559, 579 nn. 132, 133 and cases cited therein.

More importantly, all of these vintage cases dealing with creditor's rights under an executory land sale contract turned on the peculiar facts presented and do not undertake a reasoned discussion of the application of the doctrine of equitable conversion in dealing with third party creditors. Of more assistance are the commentators who have written on the topic. These commentators criticize the approach taken by the dissent and approve the one advocated herein.

Discussing the conceptual framework created by the doctrine of equitable conversion in the judgment creditor context, one author states:

> The rights of creditors of the vendor or purchaser to reach the interest of their debtor in the land contracted to be sold or purchased depend in large part on the theory of equitable conversion. Since on that theory, the purchaser is regarded as owner of the land and debtor for the purchase money and the vendor as holding legal title as security for payment by the purchaser, it logically follows that creditors of the purchaser should be able to reach the land subject to the vendor's

lien thereon, *while creditors of the vendor should be able to reach the land only to the extent of the vendor's security interest.*

3 Am.Law Real Property § 11.29, at 83 (emphasis added). *See also* McClintock on Equity § 106, at 286.

Several commentators have explicitly endorsed the cases that refuse to allow a vendor's judgment creditors to acquire a lien as against the purchaser under an executory land sale contract even though the purchase price is unpaid and the purchaser has actual knowledge of the judgment lien. 3 Am.Law Real Property § 11.29, at 86; Simpson, 44 Yale L.J. 559, 579; Lacy, 24 Case W.Res.L.Rev. 645, 662. "This works no injustice upon the creditors, who may proceed by garnishment to reach the purchase money or by bill for equitable execution to reach both purchase money and vendor's lien." 3 Am.Law Real Property § 11.29, at 86. Another commentator states:

[I]t is difficult to see why the purchaser's knowledge of a judgment against ... his vendor, should impose upon him the necessity of paying otherwise than in accordance with his contract. Some courts have held, and, it would seem with sound reason, that the vendor's judgment creditors acquire no lien as against the purchaser even though the purchase price is unpaid and the purchaser knows of the judgment. This works no injustice on the creditor, who may proceed by garnishment to reach the purchase money or by bill for equitable execution to reach both purchase money and the vendor's lien.

Simpson, 44 Yale L.J. 559, 579 (footnotes omitted).

Still another scholar concludes that even if one considers that the seller's judgment creditor's lien can attach, the creditor should not have any right to receive payments upon mere attachment of a judgment lien but only upon an execution sale. Lacy, 24 Case W.Res.L.Rev. 645, 662.

The dissent also alludes to several policy considerations which it claims support its holding. We discuss each in turn. The dissent rejects application of the doctrine of equitable conversion under a uniform real estate contract claiming that it "is hardly what most parties to a real estate sale contract have in mind. The more straightforward notion of such a contract envisions the land as changing hands only after the price is paid." However, executory land sale contracts are used by and are generally intended by the parties as long-term financing devices similar to mortgages or trust deeds. Therefore, it is not inconsistent that the effect of a judgment docketed against the seller under a uniform real estate contract should be the same as one docketed against a mortgagee or trust deed beneficiary. Furthermore, there are absolutely no facts to support the dissent's view of the parties' intentions in this case. The dissent candidly admits that the Barkers did not intend that their judgment creditors could acquire a superior position to their buyer, Ms. Hodge, under the uniform real estate contract.

The dissent further admits that "[e]nabling creditors to have access to the seller's title to the property may lessen somewhat the predictability of real estate transactions." However, it answers this concern by chiding Professor Langdell and his disciples for espousing certainty and predictability in legal doctrines. We believe there is no better place for Professor Langdell's "legal geometry" and predictability than in the transfer of real property and its effect on innocent third parties who must rely on some bright-line rule.

The dissent concludes the problems created for contract buyers by its rule are not substantial as "a prudent buyer can still assure his title by checking the judgment docket to determine if creditors' claims exist." We believe the dissent places an unreasonable burden on the buyer, one that for practical purposes will destroy the commercial feasibility of property sales by long-term contracts. Under the dissent's view, a buyer would be required to check the judgment docket before making each

monthly payment to the seller. We believe the burden is more equitably placed on the judgment creditor who can enforce his judgment under Utah R.Civ.P. 64C, 64D or 69.

Finally, we do not see how the "equities," as claimed by the dissent, are with the Clements as judgment creditors in this case. The issue is not whether the Clements should have recourse on their judgment but rather the procedural form of their remedy and the person who can be compelled to satisfy their judgment. It was the Clements who sat on their rights failing to pursue their remedies. It is not inequitable that as a result they cannot collect their judgment against a subsequent innocent purchaser.[3]

In conclusion, we reverse the summary judgment granted to the Clements and order the trial court to enter summary judgment in favor of the Cannefaxes quieting title to the Lockhart Road Property in them.

JACKSON, Judge (concurring):

The doctrine of equitable conversion runs counter to some real property law concepts and my law practice observations of the expectations of parties to real estate deals. If I had been involved in the decisions to take the route leading to adoption of the doctrine, I would not have favored the trip. At this point, there is no junction, and the principle of stare decisis requires that we continue the journey until our supreme court chooses to change course. In the meantime, we need to maintain a stable direction in the law for the benefit of those involved in real estate transactions.

J. ROBERT BULLOCK, Senior District Judge (dissenting):

I respectfully dissent. As a general proposition, I do not have great difficulty in applying the doctrine of equitable conversion to the *buyer's* interest under a installment land sale contract. I do, however, have insurmountable difficulty in applying it to the *seller's* interest to the extent that the purchase price is unpaid, which is the result under the majority opinion. I would, therefore, hold precisely opposite to my esteemed colleagues and affirm the district court.

This case was heard in the district court on stipulated facts and dismissed on a motion for summary judgment. From the limited scope of those proceedings, the single issue before the district court and on appeal is whether a contract seller's retained title is real property to which judgment creditors' liens can attach pursuant to section 78–22–1 to the extent of the unpaid price, or whether that title is personalty by reason of the doctrine of equitable conversion, to which judgment creditors' liens cannot attach. The majority's conclusion that the seller's retained title is personalty appears to me to be contrary to the case law generally, to run counter to public policy, to presume facts not in evidence, and is based upon grounds never argued here or below. I respectfully opine that the majority misinterprets the applicable case law in Utah and most other jurisdictions and reaches a result that has nothing to recommend it in terms of public policy, other than the pursuit of purely theoretical symmetry, that is to say, that if the buyer's interest might be regarded as personal property, then it invariably must follow for reasons of symmetry that the seller's interest is personal property, even though the seller has not been fully paid and has not parted with title. I explain first how the majority's opinion conflicts with the relevant Utah cases, and then turn to considerations of public policy.

Utah Case Law on Equitable Conversion

A Utah appellate court has never squarely held, until this case, that a judgment

---

3. There are no allegations that the Cannefaxes as buyers acted in bad faith in purchasing the property at issue. For cases where "sweetheart" contractual deals are entered into to defraud creditors, there is a remedy available under the Utah Fraudulent Transfer Act, Utah Code Ann. §§ 25–6–1 to –13 (1989).

against the seller and duly docketed as section 78–22–1 provides does not create a lien against the seller's legal title to land agreed to be sold under an executory installment contract because the seller's retained title was not real property. There are cases in which the Supreme Court has relied on the doctrine of equitable conversion in very different contexts; for example, in holding that the seller of property later condemned was entitled only to the contract amount[1] or in holding that the seller's interest was taxable as personal property.[2] However, the interests at stake in estate taxation and eminent domain are very different from those at stake in debtor-creditor relations, and the majority's references to dicta restating the notion of equitable conversion in such cases provide no compelling reason for applying equitable conversion to preclude a judgment lien. The purely *obiter* recitations of the general concept of equitable conversion are no authority for applying it here. Mere definition of a concept does not justify its application; we could as well define a judgment lien and thereupon insist on vindicating the lien in this case.

The most thorough elucidation to date by the Utah Supreme Court of the scope and limits of equitable conversion is found in *Butler v. Wilkinson*, 740 P.2d 1244 (Utah 1987). A footnote in *Butler* at page 1255, quoted in the majority opinion, defines the concept of equitable conversion, and it is upon that definition that the majority principally relies. However, Butler stops far short of requiring equitable conversion in every conceivable instance, and, in my analysis of it, concludes contrary to the majority opinion in this case.[3] *Butler* clearly holds that the *buyer's* interest is real property to which a judgment lien attaches subject to the seller's retained legal title,[4] but it is not all-encompassing in forcing universal adoption and application of the "parity of reasoning" for which the majority contends. The main point of the majority opinion seems to be that, because the *buyer's* interest is real property, the *seller's* interest must "logically" be personal property. However, *Butler*'s description of the "parity of reasoning," the logical symmetry that underlies equitable conversion, is not an unqualified, universal endorsement of it.

*Butler's* general, introductory restatement of the concept of equitable conversion is, according to *Butler* itself, not a universal verity that must be applied slavishly in every conceivable instance, without regard to the merits of such an application. *Butler* recognizes that equitable conversion results in a characterization of the buyer that "is not wholly accurate,"[5] and further notes that equitable conversion does not prevent a judgment docketed against the seller from becoming a lien on the seller's title to the land.[6]

After stating that judgment creditors' liens against a buyer's equitable contractual interest are not extinguished by an "assignment, sale, or rescission," the *Butler*

---

1. *Jelco, Inc. v. Third Judicial District Court*, 29 Utah 2d 472, 511 P.2d 739 (1973).

2. *Willson v. State Tax Commission*, 28 Utah 2d 197, 499 P.2d 1298 (1972).

3. *Butler* accordingly squares with the law of most jurisdictions that have considered the question. *See, e.g., First Security Bank v. Rogers*, 91 Idaho 654, 429 P.2d 386 (1967) ("The majority rule is that a judgment lien against a vendor after the making of the contract of sale extends to all of the vendor's interest remaining in the land and binds the land to the extent of the unpaid purchase price.); *Heider v. Deitz*, 234 Or. 105, 380 P.2d 619 (1963). This majority rule is further discussed later in this opinion.

4. 740 P.2d at 1255–56.

5. 740 P.2d at 1255. *Butler* further notes that equitable conversion operates to treat the buyer as owner of the land only "as a general proposition." I recognize that in many situations, it makes good sense to regard the prospective, conditional performance of the contract as if it were an accomplished fact; however, this case does not present such a situation.

6. "[A] judgment lien against the vendor's interest [is not] extinguished by the vendor's sale of that interest to a third person." 740 P.2d at 1258.

opinion continues: "Nor for that matter, is a judgment lien against the vendor's interest extinguished by the vendor's sale of that interest to a third person." [7] The Clements argue, and I agree, that this statement clearly shows that the Supreme Court considers the seller's retained title to be real property, since judgment liens attach only to real property, not to personal property, pursuant to section 78–22–1.

The majority views the seller's interest as, at most, a lien. In this regard, it is true that *Butler* analogizes the seller's interest to a purchase money mortgage, but *Butler* is careful to point out it is really no mere lien; rather, it is legal title to the land, albeit subject to a conditional promise to convey at a future date.[8] Legal title to land is not only within the definition and plain meaning of "real property" in section 78–22–1, but also it is the very archetype of what real property is.[9]

*Butler* clearly recognizes that the seller retains legal title, and that is where the analytical usefulness of the analogy to a lien ends. The seller's retained legal title is indeed similar to a lien or mortgage, in that it permits the seller to regain the land if the buyer defaults. However, the fact that the retained title may function like a lien in certain circumstances is far from saying that it is identical or equivalent to a lien for all purposes.[10] We do not have a case here in which a seller recovers property from a delinquent buyer, and therefore, the lien analogy has little utility in this particular situation. Rather, this is a case in which a third party seeks to realize a judgment out of the seller's asset, and the legal nature of that asset is the object of

our inquiry. In this context, it is quite immaterial that the buyer could lose his interest in a forfeiture that in some ways operates as a lien foreclosure. What is important for present purposes is that the Barkers held legal title, and, although they had agreed to part with it at a later date if Hodge performed her obligations, they still held legal title when the Clements docketed their judgment. Consistent with *Butler*, a judgment lien would therefore attach to that title to the extent of the unpaid balance of the contract price.

In respectful contrast to Judge Jackson's concurring opinion, I am convinced that stare decisis does not compel the result reached by the majority. Dicta in *Lach v. Deseret Bank* [11] may have expressed a view on the subject, but dicta are not holding, and only a holding of the court need be followed under the principle of *stare decisis*.[12] The precise question that is squarely presented in this case was an open question in Utah case law until this case. The prior adoption in our case law of the general notion of equitable conversion does not mean that it must apply in this case; whenever a doctrine of such broad scope is embraced, it must be fine-tuned and exceptions must be carved out to prevent injustice in the many varied applications of the doctrine. Some of the limitations on equitable conversion were explained in the *Butler* case, and in the case before us now, *Butler* clearly indicates that equitable conversion should not be applied here.

### Deficiencies in Rationale

This is the first time a Utah appellate court has squarely held that a docketed

7. *Butler,* 740 P.2d at 1258 (emphasis added).

8. *See* 740 P.2d at 1256 n. 6.

9. *See* Restatement of Property § 10 comment c (1936).

10. Justice Stewart clearly recognized the limitations of the lien analogy in the *Butler* opinion when he wrote: "The term 'vendor's lien' seems to have stuck even though it is inaccurately used before the vendor parts with the title. Until then, it is not, in fact, a lien at all, but rather a

retained interest in the land that is derived from the vendor's retention of the fee title." 740 P.2d at 1256 n. 6.

11. 746 P.2d 802 (Utah 1988).

12. *Spring Canyon Coal Co. v. Industrial Comm'n,* 74 Utah 103, 277 P. 206, 210 (1929); *Salt Lake City v. Sutter,* 61 Utah 533, 216 P. 234, 236–37 (1923).

judgment does not create a lien against the seller's retained title to real property under a contract of sale. Since we here lay down a precedent, I think it is important to examine the rationale and public-policy impacts of that holding.

The doctrine of equitable conversion is the notion that the seller of a specifically enforceable contract to convey land is deemed to own primarily [13] an interest in personal property, and the buyer's interest under the contract is characterized as real property.[14] However, while that notion leads to a sensible result in some situations, it is important not to lose sight of the fact that such a characterization of the parties' interests is not generally what they have in mind. The more straightforward notion of such a contract envisions the land as changing hands only after the price is paid; until then, the seller still owns the land and the buyer is in the unfulfilled process of acquiring it.[15] In order to understand why a legal doctrine such as equitable conversion could be acknowledged at all, when its effect is to transform realty into personalty, automatically and in disregard of the intention of the parties, a brief excursus into our legal history may be helpful.

The English common law developed along the lines of certain specific "writs" issued by the king's courts to address certain specific wrongs. Pursuant to an early statute, problems that did not fit within the scope of an existing writ could not be remedied by the king's courts, although the courts in time became somewhat adept at stretching the scope of the prescribed writs by analogy.[16] Still, many grievances, such as a simple breach of a contract, for example, were for centuries not effectively resolved by the rigid, stultified rules of the common law.[17]

When relief was not available at common law for a perceived wrong, the aggrieved person at first petitioned the king directly to intervene and do justice. The kings came to refer such petitions to their chancellors to be decided according to conscience and equity, rather than by the rigid rules of the common law. The chancellors eventually developed a system of courts, procedure, and substantive law separate from the common law, which came to be known by the word "equity."

One of the remedies commonly employed by the courts of equity was specific performance, an order directing the defendant to perform a specific act in furtherance of a contractual obligation. In a contract for the sale of land, a recalcitrant seller could be ordered in equity to specifically perform the contract, that is, to actually convey the land. If he failed to do so, he could be penalized for contempt.[18]

---

13. The "bare legal title" retained by the seller is sometimes said to be held in trust for the buyer, *see, e.g., In re Highberger's Estate*, 468 Pa. 120, 360 A.2d 580 (1976); *In re Krotzsch's Estate*, 60 Ill.2d 342, 326 N.E.2d 758 (1975); *Smith v. Tang*, 100 Ariz. 196, 412 P.2d 697 (1966), or to be a constructive lien to secure payment of the price, *see Oaks v. Kendall*, 23 Cal.App.2d 715, 73 P.2d 1255, 1258–59 (1937). The term "lien," however, is actually something of a misnomer, as the Utah Supreme Court explained in *Butler*, 740 P.2d at 1256 n. 6:

> The term "vendor's lien" ... is inaccurately used before the vendor parts with the title. Until then, it is not, in fact, a lien at all, but rather a retained interest in the land that is derived from the vendor's retention of the fee title.

14. *See generally* 3 *American Law of Property* 62–64 (Casner, ed., 1952); R. Cunningham, W. Stoebuck & D. Whitman, *The Law of Property*

698–701 (1984); H. McClintock, *McClintock on Equity* 284–88 (1948); 4 J. Pomeroy & S. Symons, *A Treatise on Equity Jurisprudence* 472–80 (1941); 2 J. Story, *Commentaries on Equity Jurisprudence* 485–92 (1918).

15. 3A A. Corbin, *Corbin on Contracts* 193–94 (1960).

16. D. Dobbs, *Remedies* 28–35 (1978).

17. *Id.;* L. Fuller & M. Eisenberg, *Basic Contract Law* 63–66 (1972).

18. The earliest origins of equitable conversion have been traced to trust concepts, independent of specific performance. Davis, *The Origin of the Doctrine of Equitable Conversion by Contract* 25 Ky.L.J. 58 (1936); Simpson, *Legislative Changes in the Law of Equitable Conversion by Contract*, 44 Yale L.J. 559 n. 3 (1935). The

One of the time-honored maxims of equity was that it "regards as done that which ought to be done." Applying this maxim to land sale contracts came to mean that if specific performance could be granted on the contract, the contract could be considered as if it had been fully performed. The seller could therefore be treated as having conveyed the property and received the price, and the buyer as having received the property. The seller was therefore deemed in equity to hold personal property, and the buyer, real property. This deeming was, of course, a legal fiction; the contract was fully performed only in the chancellor's imagination. The reality was that a deed would be delivered and the seller would consider himself no longer the owner when the sale had been consummated by receipt of the full price.[19]

When the English legal tradition was transplanted to America, the doctrine of equitable conversion came along with it. In 1905, the American legal scholar Christopher Columbus Langdell systematized it elaborately, and it almost seems as if Langdell placed his philosophical mark upon the doctrine, making it into a "legal geometry" or a "heaven of juristic conceptions."[20] For Langdell, law was a science, whose data in the English tradition were the prior decisions of courts.[21] To the legal scientist, cloistered in the library that was his laboratory, it was irrelevant whether the rule extracted from the cases produced a result that was in reality unjust or at odds with common sense. What mattered was not whether the rule was a good one but rather whether it was the rule.[22]

This rather mechanistic, wholly abstract view of the law has fallen upon evil days in recent decades. Sociological jurisprudence and legal realism waged a war of commentary on the application of fixed rules without regard to fairness in an individual case or to social policy. In particular, equitable conversion came to be explained as a "name given to results reached on other grounds."[23] No longer was it a set of substantive rules describable in clauses beginning with "if" and "then"; rather, it was simply a shorthand method of describing what came after the "then." There was still little thought of adding an express "because . . .," or of explaining the reasons for either the substantive rule or the result in a specific case.

This inattention to the reasons for equitable conversion led to some roundhouse critiques of the doctrine. Harlan Stone debunked it in a 1913 article.[24] Several other writers also denounced, and uniform legislation was proposed to counteract, its effect of placing the risk of casualty loss on the buyer during the executory period.[25] Some cases hedged in relying on the eq-

---

current formulation of the doctrine, however, is firmly linked to the specific enforceability of the contract, perhaps due to the oft-cited formulation by Lord Eldon in a case seeking specific performance, *Seton v. Slade,* 7 Ves.Jun. 265 (1802).

**19.** The fictional character of the rule is apparent in the fact that equity would not invoke it to give the purchaser any real incidents of ownership before the time set for performance. H. McClintock, *McClintock on Equity* 295 (1948).

**20.** 3 *American Law of Property* 64 (Casner, ed., 1952).

**21.** Address by C.C. Langdell delivered November 5, 1886, reprinted in *Law Quarterly Review* 123, 124 (1887).

**22.** For example, Langdell noted in his casebook on contracts that the "mailbox rule" holding that acceptance is effective on dispatch, regardless of whether it is received, had been criticized as leading to unjust and absurd results. "The true answer" to that criticism was, according to Langdell, "that it is irrelevant." C.C. Langdell, *A Selection of Cases on the Law of Contracts* 995–96 (2d ed. 1879).

**23.** Pound, *The Progress of the Law,* 33 Harv.L. Rev. 813, 832 (1920); *see also* Stone, *Equitable Conversion by Contract,* 13 Colum.L.Rev. 369 (1913).

**24.** Stone, *Equitable Conversion by Contract,* 13 Colum.L.Rev. 369 (1913).

**25.** E.g., Vannemann, *Risk of Loss in Equity between the Date of Contract to Sell Real Estate and Transfer of Title,* 8 Minn.L.Rev. (1924); Williston, *The Risk of Loss After an Executory Contract of Sale in the Common Law,* 9 Harv.L. Rev. 106 (1895).

uitable conversion doctrine, declaring that it would be invoked only when it led to a fair result.[26] Contrary to the majority's claim, my thorough reading of the modern commentary on equitable conversion generally reveals little enthusiasm for universal application of the doctrine and no persuasive reasoning to support its application in this case.

The scholarly criticism of the blind application of the doctrine of equitable conversion has, however, been only partially successful in preventing its misuse in the courts. Leading commentators have recently noted that "decisions [on equitable conversion] often seem adamant in their unwillingness to discuss the underlying policy issues; equitable conversion almost becomes a substitute for thinking about the real questions in the case."[27] There is no justification for ignoring what is actually happening in a case and what the parties' clash of interests is really all about. Invoking a talisman such as "equitable conversion" to give a name and ostensible legitimacy to a rule without a rationale is a jurisprudential cop-out, and exposes society to potential danger from rules that have drifted from their public policy moorings. In my opinion, courts have a responsibility to continually scrutinize the law we apply, particularly judicially-created law such as equitable conversion, in order to weed out defects in the law as it has been handed down to us and to keep it consistent with evolving social policy and conditions.[28]

Viewing the policies and practical reasons for equitable conversion, I firmly believe that it is not a rule that should be applied as a matter of course in every instance. Rather, it describes a result in which the seller's interest is deemed to be essentially personalty and the buyer's interest to be realty. In reaching that result, the court should endeavor, as with any contract, to give effect to the reasonable expectations of the parties.[29] While applying equitable conversion automatically for every question involving a land sale contract may foster easy predictability, it would nevertheless in many instances disregard or frustrate what the parties intended their contract to accomplish, which is a transfer of property when it is paid for, but not before. The contract in this case, for example, clearly contemplates a transfer of ownership by deed after all installments have been paid.

One involuntary consequence[30] of the seller's retention of title to the property is that his creditors may reach it in satisfac-

**26.** *E.g., Clay v. Landreth,* 187 Va. 169, 45 S.E.2d 875 (1948); *In re Seifert's Estate,* 109 N.H. 62, 242 A.2d 64, 33 A.L.R.3d 1276 (1967); *National Bank of Topeka v. Saia,* 154 Kan. 740, 121 P.2d 251 (1942).

**27.** R. Cunningham, W. Stoebuck & D. Whitman, *The Law of Property* 699 (1984).

**28.** *See Hackford v. Utah Power & Light Co.,* 740 P.2d 1281, 1285–86 (Utah 1987); B. Cardozo, *The Nature of the Judicial Process* 98–142 (1921). Holmes expressed both the compunctions and the necessity felt by a person who must discharge this responsibility in saying that he "hesitate[s] to affirm universal validity for his social ideals" and "may be ready to admit that he knows nothing about an absolute best in the cosmos, and even that he knows next to nothing about a permanent best for men. Still it is true that a body of law is more rational and more civilized when every rule it contains is referred articulately and definitely to an end which it subserves, and when the grounds for desiring that end are stated or are ready to be stated in words." Holmes, *The Path of the Law,* 10 Harv. L.Rev. 457, 468–69 (1897).

**29.** 1 A. Corbin, *Corbin on Contracts* 1–3 (1963); *see also John Call Engineering, Inc. v. Manti City Corp.,* 743 P.2d 1205, 1207 (Utah 1987); *Lundstrom v. Radio Corp. of Am.,* 17 Utah 2d 114, 405 P.2d 339 (1965); *Carlson v. Hamilton,* 8 Utah 2d 272, 332 P.2d 989 (1958).

**30.** We recognize that the buyer and seller in this case, like most, probably did not intend for a judgment lien to attach to the seller's interest shortly before the seller conveyed to the buyer, and they would have precluded the lien, if that were possible. However, the law also recognizes the rights of a party's creditors to reach assets in satisfaction of their judgments, without regard to the debtor's preferences in the matter. Therefore, once it is clear that they have, by their intent, retained a property interest, the rights of creditors to reach that interest operate without regard to what the debtor-promisor and his promisee may have intended.

tion of their claims against him. Enabling creditors to have access to the seller's title to the property is thought by the majority to lessen the predictability of real estate transactions. However, a prudent buyer can still assure his title by checking the judgment docket to determine if creditors' claims exist. In this and most sales, the buyer has recourse against the seller if title is encumbered, and, if the encumbrance is serious, may rescind the sale.[31] If, however, the buyer ignores the encumbrance, he proceeds at his peril, unless he can prove himself to be a bona fide purchaser or invoke statutory protection such as the recording act.[32] Neither Hodge nor the Cannefaxes attempted to rescind, or asserted that they are bona fide purchasers or protected under the recording act. In these circumstances, there is nothing wrong with leaving the loss to fall upon the buyer, who is able to discover in advance the faults in the title and take corrective action.

In determining the legal effect of a contract, therefore, the intent of the parties[33] should carry far more weight than a legal fiction, however deep in tradition the fiction's roots. People have a right to make contracts and to have their lawful contractual intentions fulfilled, and they cannot fairly be expected to make contracts with a thorough knowledge of the oblique way in which nine centuries of equitable jurisprudence may twist and "convert" the meaning of their intentions.[34] In holding that the buyer's and seller's interests are equitably converted, the majority is oblivious to

the face of the contract itself, which provides that the seller will convey the real property when the price is received, and not before. It was undisputed that the price was not received when the Clements' judgment was docketed.

In my view, the majority also places insufficient value in the need to efficiently enforce judgments. They intimate that the Clements could have executed on their judgment, but ignore the fact that their execution was judicially restrained in this case. It is also unclear in Utah law that the Clements have anything on which they could execute, without a judgment lien. At common law, execution cannot be levied on a chose in action,[35] and, although that common law rule has been changed by statute in many jurisdictions, there is no applicable Utah statute. Thus, by reducing the seller's interest to a mere contract receivable, the majority leaves the judgment creditor without a clear, sure means of reaching the seller's contract interest under our law, other than by garnishing each payment as it accrues. Enforcing a duly entered judgment thus becomes a cumbersome process of having a writ issued and served before each installment is paid.

Most jurisdictions that have considered this question have weighed the policy considerations as I do. Contrary to the assertion of the majority, the scholars studying this question all conclude that the majority of jurisdictions hold that a judgment lien attaches to the seller's interest in a contract for the sale of real property.[36]

More persuasive, however, than the results of any interstate judicial poll are the

---

**31.** *Bergstrom v. Moore,* 677 P.2d 1123 (Utah 1984); *Callister v. Millstream Assocs., Inc.,* 738 P.2d 662 (Utah App.1987).

**32.** *See Gregerson v. Jensen,* 669 P.2d 396, 398–99 (Utah 1983).

**33.** Contrary to the majority's view, the intent of the parties is clear from the face of their contract, and, under the parol evidence rule, extrinsic evidence is unnecessary and inadmissible. *Ron Case Roofing and Asphalt Paving, Inc. v. Blomquist,* 773 P.2d 1382, 1385 (Utah 1989).

**34.** Other equitable doctrines, such as estoppel, laches, unclean hands, etc. are not subject to

this same criticism. Rather, they serve to carry into effect the fair and reasonable intentions of the parties.

**35.** 33 C.J.S. Executions § 28 at 158–59 (1942).

**36.** *E.g., Monroe v. Lincoln City Employees Credit Union,* 203 Neb. 702, 279 N.W.2d 866 (1979); *First Security Bank v. Rogers,* 91 Idaho 654, 429 P.2d 386 (1967); *Heider v. Deitz,* 234 Or. 105, 380 P.2d 619 (1963). Surveys of case law on point include R. Cunningham, W. Stoebuck & D. Whitman, The Law of Property 701 (1984); Lacy, *Creditors of Land Contract Vendors,* 24 Case W.Res.L.Rev. 645, 646 (1973); 3 *Am. Law of Property* 11.29 at 85 (1952).

compelling needs to recognize the parties' contractual intent and to provide an effective means of enforcing judgments. Conversely, there is no real reason favoring equitable conversion in this setting, other than perhaps a wish for abstract symmetry or *elegantia juris*, which could incline one to the notion that, since the buyer has real property under equitable conversion principles, the seller must conversely have personal property for all purposes, including the attachment of judgment liens.[37] However, to give way to such a wish in disregard of the parties' intent and of the need to enforce lawful judgments is sheer formalism, a glorification of abstraction for abstraction's sake.

### Potential Defenses Not Raised

The Cannefaxes' position here and in the district court has consisted only of an attempt to invoke equitable conversion to prevent the Clements' judgment lien from attaching. The Cannefaxes have not asserted any defenses against the enforcement of the Clements' lien, once it attached. Ordinarily, there would be little need to mention defenses never raised by the parties, but in this case, I believe the majority has, in effect, given some weight

to those potential defenses. They presume, for example, that the Cannefaxes are bona fide purchasers, and they also view the Clements as having failed to perform a duty to give actual notice to the Cannefaxes, in order to "perfect," in a sense, their lien against the Cannefaxes. However, the Cannefaxes' *bona fides* and lack of actual notice are unproven facts that might have been material to defensive arguments that were never raised. Since the Cannefaxes had the burden of avoiding the lien in order to quiet title,[38] judgment against them is correct, even though there was no apparent inquiry into either actual notice, the Cannefaxes' knowledge of the judgment or lack of it, or into their *bona fides* in any respect.

As the majority also points out, several jurisdictions have held that the judgment lienor cannot recover from the buyer any installment payments made in the ordinary course of contract performance without actual notice of the existence of the judgment lien.[39] These holdings are rooted in concern that the buyer not be required to check the judgment docket every time an installment payment is made; such would be an "intolerable inconvenience."[40] Instead, the buyer is permitted to continue paying installments, which are credited against the price, until the buyer is given

---

**37.** It is perhaps ironic that equity, which began as an effort to overcome the constricting formalism of the common law writ system, came to have such a penchant for wholly abstract logical symmetry. Some of this devotion to abstract symmetry has already been discarded; the old equitable doctrine of mutuality of remedy, for example, which held that an equitable remedy could be granted to the plaintiff only if the defendant, under like, hypothetical circumstances, could obtain the same remedy, has been totally discarded. *Utah Mercur Gold Mining Co. v. Herschel Gold Mining Co.*, 103 Utah 249, 134 P.2d 1094, 1097 (1943) ("The remedy of one should not depend upon the hypothetical case of what another could demand if the situation were different."); *Genola Town v. Santaquin City*, 96 Utah 88, 80 P.2d 930, 934 (1938).

**38.** *Olsen v. Park Daughters Inv. Co.*, 29 Utah 2d 421, 511 P.2d 145 (1973).

**39.** *May v. Emerson*, 52 Or. 262, 96 P. 454 (1908); *Wehn v. Fall*, 55 Neb. 547, 76 N.W. 13 (1898); see R. Cunningham, W. Stoebuck & D. Whitman, *The Law of Property* 702 (1982); Lacy,

*Creditors of Land Contract Vendors*, 24 Case W.Res.L.Rev. at 646–47; A. Freeman & E. Tuttle, *A Treatise on the Law of Judgments* 965 (5th ed. 1905).

**40.** *Moyer v. Hinman*, 13 N.Y. 180 (1855). Such concern certainly has its place in adjudication, and Utah case law has recognized that simple fairness and "the equities" may properly be considered in reaching a decision. *Jacobson v. Jacobson*, 557 P.2d 156, 158 (Utah 1976); but see *Briggs v. Liddell*, 699 P.2d 770, 772 (Utah 1985) ("equitable powers are narrowly bounded"). However, an unstructured, unguided inquiry into "whatever's fair" invites subjectivity and inconsistent, uncertain results, and the often elusive and ethereal nature of "fairness" would leave little effective means, other than litigation, for resolving disputes. I would therefore prefer to see such equitable concern take a more structured form, such as laches. Under that doctrine, a lienor would be barred from enforcing the lien if the lienor delayed in asserting his rights while his adversary performed reasonably and innocently to his detriment. *See Borland v. Chandler*, 733 P.2d 144 (Utah 1987).

actual, not merely constructive, notice of the lien. I have no quarrel with such a conclusion, but there is absolutely no occasion to reach it in this case, since there is no indication in the stipulated facts whether or not the Cannefaxes had actual notice of the lien at a time when they could have averted consummation of the sale. The Cannefaxes, in seeking to quiet title against the Clements, had the burden of going forward with evidence showing that the lien was unenforceable.[41] All section 78–22–1 requires for a lien to attach is entry of the judgment and docketing in the proper county. The judgment creditor is not required to do anything more, such as give actual notice to a contract buyer, and to require more would run contrary to section 78–22–1.[42]

### Conclusion

In conclusion, I believe there is no question but that the *buyer's* interest in an executory land sale contract may be characterized as real property under the fiction of equitable conversion for the purpose of the attachment of the buyer's judgment creditors' liens. However, the cases, including *Butler*, do not hold that because the *buyer's* interest may be considered real property for that purpose, it must then necessarily follow that the *seller's* retained title is personalty to which the liens of the seller's judgment creditors cannot attach.

In my opinion, the rule to be deduced from *Butler* and the cases cited therein is that the seller's retained title in an installment land sale contract was, is, and remains real property to the extent of the unpaid balance of the purchase price for the purposes of the attachment of liens of the seller's judgment creditors. Further, by reason of the fiction of equitable conversion, the buyer's interest may also be characterized as real property, limited only by the right of the seller to receive the pur-

chase price and the performance of other terms of the contract.

I recognize that the recording statutes and bona fide purchaser considerations are significant and may be overriding in a given case.[43] However, no such matters appear from the stipulated facts in this case and none were raised or argued in the district court or here on appeal.

From the cases, as well as an examination of the historical underpinnings of the equitable conversion fiction, which is not a doctrine of universal application, I am regrettably compelled to respectfully disagree with the majority's opinion, and I would affirm the trial court.

41. *Olsen v. Park Daughters Inv. Co.,* 511 P.2d at 146. There are several other potential arguments which, in an appropriate factual setting, the buyer could have asserted against the lien. However, we have neither facts nor argument to enable us to determine, for example, whether the title company handling the closing was negligent and could have reversed the transaction by returning escrowed deeds and money when it learned of the lien, or whether the Clements' lien is inferior in priority to the interests of Hodge and the Cannefaxes.

42. *Taylor Nat'l, Inc. v. Jensen Bros. Constr. Co.,* 641 P.2d 150, 154–55 (Utah 1982).

