Gerald **NIELSON** and Ruth S. Nielson, husband and wife, Plaintiffs and Appellants,

v.

J. Robert **DROUBAY** and Bonnie C. Droubay, husband and wife, Defendants and Respondents.

No. 17385.

Supreme Court of Utah.

July 20, 1982.

---

Milton T. Harmon, Nephi, for plaintiffs and appellants.

William B. Parsons III, Salt Lake City, D. John Musselman, Provo, for defendants and respondents.

STEWART, Justice:

Plaintiffs, the Nielsons, initiated this action to evict the defendants, the Droubays, from a home and ranch properties. The Droubays were in possession under an option to purchase from the Nielsons. Nielsons' position is that the Droubays did not comply with the terms of the option and that a contract of purchase was not consummated. Droubays answered and counterclaimed, denying Nielsons' allegations and asserting that the terms of the option agreement had been complied with and that

it was because of Nielsons' failure to proceed in good faith to honor the terms of the option agreement that a contract of sale was not completed and executed.

After a plenary trial, the trial judge prepared a memorandum decision in which he made a complete analysis of the evidence and the law, and resolved the disputed issues in favor of the Droubays. He found that the Droubays had exercised their option to purchase and that the Nielsons had breached their agreement by failing to proceed in good faith to consummate the sale. Judgment was awarded the Droubays on their counterclaim for damages based on the loss of bargain.

In our treatment of the facts, we are obliged to assume that the trial judge believed those aspects of the evidence which support his findings and judgment. *Tanner v. Baadsgaard,* Utah, 612 P.2d 345 (1980); *FMA Financial Corp. v. Hansen Dairy,* Utah, 617 P.2d 327 (1980); *Robertson v. Hutchison,* Utah, 560 P.2d 1110 (1977).

In the fall of 1969, the Nielsons listed for sale a substantial complex of properties with Equitable Realty, Inc. The listing included Nielsons' home in Lynndyl; their ranch properties in Millard, Juab and Sanpete Counties; and water rights, mineral rights, grazing rights, various farm equipment, and 450 head (stated to be more or less) of Angus cattle. As a result of the realtor's efforts, the Nielsons and the Droubays on March 30, 1970, executed an option agreement under which the Droubays would take possession and operate the property. The terms of the option were a base price of $475,000 to be paid out in 15 years, with 7% interest on deferred balances; a $10,000 down payment (which was paid); possession to be taken by Droubays April 15, 1970 (which they did); and an option to purchase to be exercised by Droubays' notifying the Nielsons and paying an additional $20,000 by January 25, 1971. A collateral agreement of cooperation was executed, which provided that the parties would share the operating expenses and income for the year 1970, including payments from the Agricultural Conservation Service of the United States Department of Agriculture.

On the day the option was to be exercised, January 25, 1971, Robert Droubay took the necessary funds to his attorney, H. James Clegg, in Salt Lake City and asked his assistance in exercising the option. The option price was to be paid by a credit of $4,300 due the Droubays from the Nielsons, a cashier's check for $15,000, and a personal check for $700. The attorney prepared a written notice of the exercise of the option and called Mr. Howard Hatch of Equitable Realty in Provo, the agent who was handling the matter for the Nielsons. Mr. Clegg explained that there was a violent winter storm raging in the Salt Lake-Provo area, making travel extremely dangerous. Clegg asked Hatch to contact his principal, Nielson, tell him that Clegg had the Droubays' funds and declaration to exercise the option, and ask him if he would agree to consider the option as having been exercised, with Clegg holding the proceeds and the declaration for Nielson, subject to Nielson's direction. If this were not acceptable, Clegg stated he would brave the storm and see that delivery was made on that date. Hatch called Nielson and then called Clegg back relaying Nielson's agreement to consider the option exercised without actual delivery of the funds that day by Clegg.

Nielsons first attack the trial court's judgment on the ground of res judicata. They claim that it had earlier been judicially determined that the option had not been exercised by the Droubays and that that determination was binding in this case. In *Equitable Realty Co. v. Nielson,* 30 Utah 2d 433, 519 P.2d 243 (1974), Equitable Realty sued Nielson for a real estate commission on the same transaction that is at issue here, i.e., the consummation of the option agreement. In that case Nielsons prevailed on their contention that the option had not been exercised. Nielsons now argue that because this Court found Equitable had not produced a ready, willing and able buyer, the Droubays are precluded in this action from recovering on their counterclaim because of res judicata or collateral estoppel.

■ Res judicata prevents the same parties or their privies from litigating the same issues in subsequent litigation. *Knight v.*

*Flat Top Mining Co.,* 6 Utah 2d 51, 305 P.2d 503 (1957). "Collateral estoppel, on the other hand, arises from a different cause of action and prevents parties or their privies from relitigating facts and issues in the second suit that were fully litigated in the first suit." *Searle Brothers v. Searle,* Utah, 588 P.2d 689 (1978). Here, the trial court rejected Nielsons' contention that the Droubays were bound by the judgment in *Equitable* because the Droubays were neither parties to that action, nor in privity with any party to that action, and they therefore could not be bound by the judgment in that case. *Id.*

 In this jurisdiction we have abandoned the rule requiring mutuality of parties in collateral estoppel cases. The established rule is that a stranger to a judgment may assert a judgment *against* one who actually litigated an issue that was necessarily decided by the judgment and thereby preclude the relitigation of the same issue. *Searle Brothers v. Searle, supra, Richards v. Hodson,* 26 Utah 2d 113, 485 P.2d 1044 (1971). However, the converse is not true. One who has litigated an issue may not assert a favorable judgment *against* another who did not have an opportunity to litigate the issue. *Ruffinengo v. Miller,* Utah, 579 P.2d 342 (1978); *State v. Parker,* 13 Utah 2d 65, 368 P.2d 585 (1962). Because the Droubays were not parties to the *Equitable* action, the judgment in that case does not preclude the litigation of their claim that the option was exercised.

Alternatively, Nielsons contend that the option was not lawfully exercised in any event. They state that an option must be exercised exactly in accordance with its terms and argue that the evidence does not support the trial court's determination that that was accomplished here.

Mr. Nielson, in giving his version of his conversation of January 25, 1971, with his real estate agent Howard Hatch, in response to questions as to why Nielson did not then insist that the Droubays' proffer was unacceptable, stated that Hatch told him that he had to accept. The substance of Nielson's testimony is, "I didn't agree to anything. I was just told and that was it." Passing over the issue of the legal effect of that version of the facts, we think that other evidence clearly establishes that Nielsons considered the option exercised on January 25, 1971. Nielsons' real estate agent Hatch testified in part:

I told Bob [Defendant Robert Droubay] that I preferred if he would come down to Provo, at least, and deposit the money with me but that I would do as he requested and that was to call Mr. Nielson to see if Mr. Nielson would accept that as sufficient notice that he intended to exercise the option.

Q. Did you then hang up and telephone Mr. Nielson?

 * * * * * *

A. Yes, and I was able to reach Mr. Nielson and he said that in view of the circumstances he would be happy to extend that courtesy and that he would consider that as sufficient notification that Mr. Droubay intended to exercise the option.

 * * * * * *

Q. Now, Mr. Nielson has testified in this trial, that you told him he didn't have any other choice but to accept this arrangement. Do you recall telling him anything like that?

A. I don't recall saying anything like that.

Q. Do you recall whether Mr. Nielson made some objection about the fact that he wanted the money and he wanted it right now?

A. No, sir, *I'm absolutely certain* in my own mind that *he did not make such a statement because had he made such a statement, I would have insisted that Mr. Droubay make the drive and at least deposit the money with me as Mr. Nielson's broker.* [Emphasis added.]

It appears that Hatch's testimony was believed by the trial court. The testimony of Hatch, if not of Nielson himself, was sufficient to support the finding that the defendants had exercised their option.[1] It

---

1. Mr. H. James Clegg, who had withdrawn as defendants' counsel, apparently because it seemed necessary for him to be a witness, also testified and corroborated Mr. Hatch's account of those occurrences.

is also noteworthy that the parties continued through their attorneys to try to work out details of a contract covering all aspects of this somewhat complex transaction without any objection by the Nielsons.

After several efforts to achieve that objective, Mr. Clegg, on March 9, 1971, wrote a letter to Mr. Harmon, counsel for Nielsons, pointing out areas in which there was still need for agreement or clarification. Specifically, Clegg mentioned a warranty which plaintiffs were to give on the cattle; the valuation to be placed on the home and whether and when a separate deed was to be given; the manner of handling grazing permits held jointly between Mr. Nielson and his brother; a restriction on defendants' right to assign the contract; and an issue concerning 22 tons of the 1970 barley crop which had been taken by Intermountain Farmers in satisfaction of Mr. Nielson's account. The letter concluded by saying that unless the contract "can be worked out within the next few days, they [the Droubays] are going to execute and deliver to you a Uniform Real Estate Contract. If Mr. Nielson refuses to sign that contract, suit will be initiated and the down payment monies will be paid into court."

The evidence is that Mr. Clegg prepared and submitted for Nielsons' approval another proposed final draft of a contract covering the matters upon which the parties had not reached agreement. In addition, the Nielsons, without responding thereto or serving any other demand or notice on the Droubays, filed this action to evict defendants from the property and had notice of eviction served upon them.

■ We agree with the general rule advocated by Nielsons that an option must be exercised by the optionee in accordance with its terms. *Lincoln Land and Development Co. v. Thompson,* 26 Utah 2d 324, 489 P.2d 426 (1971). But as a predicate to the invocation of that rule, both the optionor, and the optionee must have acted fairly and in good faith to fulfill their obligations to each other. Under the circumstances shown, we see no persuasive reason to disagree with the view taken by the trial court

that there was nothing unfair or obstructive in the position of the Droubays and the proposal and choice given to the Nielsons as stated in Mr. Clegg's letter of March 9, 1971.

■ From what has been said above, it is our opinion that the trial judge was justified in his view that where the Droubays had, in exigent circumstances beyond their control, offered substantial compliance with the option, and that compliance was accepted by the Nielsons and relied on by the Droubays, the Nielsons could not unilaterally and without just cause renege on their acceptance.

■ As to damages, the trial court made a detailed computation of the assets involved, showing that the difference between the fair market value of the properties at the time of the breach was $69,560 more than the agreed contract price, adjustments for credits and off-sets due each of the parties, and entered judgment accordingly. Attorney's fees in the sum of $4,340 were also awarded the Droubays. All the necessary figures and computations find support in the record.

Other claims of error by the Nielsons have been considered and are deemed not of sufficient merit to warrant discussion.

■ Droubays cross-appealed urging that the trial court erred in failing to award them pre-judgment interest from the time their damages occurred. Even assuming that interest may be awarded in cases such as this, Droubays' conduct precludes an award of interest. The trial court stated, "... a substantial number of the delays, in this long-pending case were at the instance of or agreed to by the defendants."

Affirmed. Costs to respondents.

OAKS, HOWE and DURHAM, JJ., concur.

HALL, C.J., does not participate herein.