**BREUER–HARRISON, INC., Casper J. Breuer and William Harrison, Plaintiffs and Appellees,**

v.

**Keith and Evelyn COMBE, Defendants and Appellants**

**and**

**Robert E. Froerer, Attorneys' Title Guaranty Fund, Inc., Clair C. Combe as Trustee for Philip Combe, Defendants and Appellees.**

**Keith and Evelyn COMBE, Clair C. Combe as Trustee for Philip Combe, Plaintiffs and Appellants,**

v.

**Casper J. BREUER and William M. Harrison, Plaintiffs and Appellees.**

**No. 880353–CA.**

Court of Appeals of Utah.

Sept. 24, 1990.

Rehearing Denied Oct. 15, 1990.

John P. Ashton and Erik Strindberg, Salt Lake City, for defendants and appellants Keith and Evelyn Combe.

Jack L. Schoenhals, Salt Lake City, for plaintiffs and appellees Breuer–Harrison, Inc., Casper J. Breuer and William Harrison.

Theodore E. Kanell, Salt Lake City, for defendant and appellee Robert E. Froerer.

David E. West and Bruce A. Maak, Salt Lake City, for defendant and appellee Attorneys' Title Guar. Fund.

Bernard L. Allen, Ogden, for plaintiff and appellant Clair C. Combe.

## OPINION

Before GREENWOOD, JACKSON and ORME, JJ.

GREENWOOD, Judge:

Appellants Keith and Evelyn Combe appeal the trial court's summary judgment for appellees, Breuer–Harrison, Inc. (B–H), Casper J. Breuer, and William Harrison, against the Combes for anticipatory repudiation of a real estate contract entered into by the parties. The Combes also appeal the trial court's summary judgment dismissing the Combes' cross claims against appellees Attorneys' Title Guaranty Fund, Inc. (ATGF) and Robert Froerer. We affirm in part and reverse and remand in part.

The property in question is an undeveloped parcel of approximately twenty acres located in south Ogden, Utah. It was originally part of a farm developed by Keith Combe's grandfather. In the early 1960s, the Weber Basin Water Conservancy District (Weber Basin), by condemnation proceedings, obtained a thirty-foot wide easement on the property and constructed a water pipeline within the confines of the easement. Sometime in the 1970s, Keith Combe's mother divided the property into four parcels, conveying a parcel each to Keith Combe and his three siblings. One of the parcels distributed to Keith Combe's siblings was held in a trust managed by First Security Bank (Bank).

In 1979, Breuer and Harrison, the sole stockholders in B–H, a California corporation, became interested in purchasing property in Utah for development projects. They contacted Steve Keil, an Ogden real estate agent, who showed them several large parcels of property in the Ogden area. One of the properties they examined was the property owned by Combe and his siblings. Keil, Breuer, and Harrison walked across the Combe property and examined the county plat maps and available demographic and economic data.

Sometime in August 1979, Breuer and Harrison entered into an oral agreement with Keil, Bruce Nielson, who owned the real estate firm where Keil worked, and Duane Bruce, another agent for the firm. They agreed that Keil, Nielson, and Bruce would have a twenty-five percent equity interest in the Combe property after a proposed purchase. The three were to share with B–H the costs, expenses, and all required payments under the Combe contract. A "memorandum of understanding" outlining the terms of the agreement was drafted and signed by all five individuals sometime in December 1979.

In August 1979, Keil contacted Jay Anderson, owner of an engineering firm, Great Basin Engineering (GBE), and asked Anderson to sketch some subdivision layouts of the Combe property. To assist B–H in determining the suitability of the Combe property as a residential subdivision, GBE subsequently performed, prior to B–H's purchase of the property, a variety of engineering tasks, including extensive soil testing, on-site ground water analysis, runoff flow analysis, and placement of road alignment.

Anderson assigned the actual design sketch work to Charles Olsen, an engineer at GBE. Olsen first prepared a base sheet by tracing information from a Weber County topography map. The base sheet showed the property boundaries, surrounding subdivisions, streets, and a dotted line marked "Aqueduct,"[1] crossing the property diagonally in a northwest direction. By placing tracing paper over the base sheet, Olsen prepared several different sketches.

1. According to Anderson, the marking of "Aqueduct" on the base sheet was inappropriate since it was really an underground pipeline. Webster's defines "aqueduct" as a conduit or artificial channel for conveying water; one for carrying a large quantity of water which flows by gravitation. Webster's Third New International Dictionary 108 (1986). Webster's defines "pipeline" as a line of pipe connected to pumps, valves, and control devices for conveying, in part, liquids. *Id.* at 1722.

Because of the aqueduct marking, Olsen assumed there was an easement and asked Anderson the size of the easement, since Olsen typically included such information on a drawing. Olsen testified in deposition that Anderson told him the information was not available, to just go ahead and prepare the sketches. Olsen made no further attempt to determine the size of the easement. He did, however, make allowance for the aqueduct or pipeline, by putting a roadway over the top of it on the plat maps. He also testified that had he known of the thirty-foot easement, he would have plotted it on the base sheet.

Anderson was aware of the pipeline since its installation on the Combe property in the early 1960s. He testified in deposition that the aqueduct marking was originally put on Weber County aerial surveys in 1963. At the time Keil contacted him in 1979, Anderson believed there was probably a twenty to thirty-foot easement that belonged to Weber Basin, but was unaware of the exact width. Anderson understood that a house could not be built on the pipeline but assumed that either a roadway or back lot line could be put on the pipeline. Prior to B–H's purchase of the Combe property, Anderson worked primarily with Keil.

From exhaustive testimony, it is clear that in September 1979, Keil was aware of what he considered a small waterline which traversed the Combe property. It is also clear that Keil did not learn of the pipeline easement until 1983. Keil testified in deposition that his recollection of what he knew of the waterline in September 1979 was hazy due to it being a "nonissue." He testified that the biggest concerns in his discussions with Anderson in the fall of 1979 regarding the Combe property involved sewage and drainage problems. Although the exact time is uncertain, sometime in September 1979, Anderson apparently talked with Keil about the waterline or pipeline and putting a roadway over it. Keil viewed the waterline as a minor problem in the development plans, one that could easily be accomodated by building a road over it to insure profitability. According to Keil, in 1983 he first learned of an easement and aqueduct, which he did not relate to the waterline because in his mind there was a significant size difference between the two. Anderson testified in deposition that he told Keil that the pipeline was relatively small compared to usual Weber Basin standards. He also testified that there was no way Keil would have known of the thirty-foot easement in 1979.

On September 19, 1979, a meeting was held with Breuer, Harrison, Keil, and Olsen in attendance. This was Breuer's and Harrison's first contact with GBE. The group reviewed Olsen's rough sketches and discussed the number of lots, location of road alignment, and water treatment, sewage, and drainage problems. None of those in attendance at the meeting recall which sketches were analyzed. There is no evidence that the base sheet showing "Aqueduct" was shown to Breuer, Harrison, or Keil. Breuer and Harrison testified in deposition that an easement was not discussed at the meeting and that the first they heard of the pipeline and easement was in 1983. Olsen had no recollection of what was discussed at the meeting. Keil testified to having no independent recollection of ever talking with either Breuer or Harrison regarding a waterline or pipeline either at this meeting or at any time prior to 1983, but only conjectured that a waterline was probably a topic of conversation at some time. He specifically testified that he did not discuss with Breuer or Harrison an easement at any time prior to 1983.

Sometime in the fall of 1979, Keil contacted Robert E. Froerer, an Ogden attorney, and asked him to do certain legal work in connection with a real estate transaction involving property in Ogden. Froerer prepared the necessary legal documents, deeds, and exchange agreements, that enabled a series of property trades between Keith Combe and his siblings so that Keith Combe and the Bank would end up with the entire property. Froerer also drafted a preliminary purchase agreement which was executed by B–H on approximately November 1, 1979. Froerer then prepared a real estate contract for the Combe property which established a sales price of $410,880

and required a down payment of $75,000. Beginning on December 31, 1980, and continuing for the next three years, B–H was to make annual interest-only payments. The balance of the purchase price was due in full on December 31, 1983.

Paragraph eight of the real estate contract required the Combes and the Bank to warrant title to the property, to furnish a title policy, and to convey the property by warranty deeds. The paragraph was nearly identical to paragraph fourteen in the preliminary purchase agreement. Paragraph eight of the contract reads as follows:

> Seller warrants that there are no liens or encumbrances on the property hereinabove described and agrees to furnish to Buyer at Seller's expense a title policy showing good and marketable title in said property (said title policy to be furnished at the time of the receipt of down payment from Buyer). Further, Seller agrees to execute and deliver to Buyer, or assigns, good and sufficient warranty deeds covering title to the above-described property when subdivided and as paid for in accordance with the terms hereinabove set out.

Paragraph four required that an escrow account be set up, that the Combes convey title by warranty deed to an escrow agent to be named later, and that this agent convey title to B–H by special warranty deed as payments were made. Paragraph five, which disclaimed warranties, stated: "The Seller hereby expressly disclaims any and all warranties and representations, express or implied, as to the state of the property, its condition, quality, character, or suitability or fitness for any sue [sic], whether existing or contemplated, matters of zoning, or in other respect."

Keil testified in deposition that on one occasion prior to the closing, he went with Keith Combe to the office of Combe's personal attorney, Paul Kunz. Kunz reviewed documents, including the preliminary purchase agreement, and made some changes. Keil further testified that Keith Combe was adamant about Kunz reviewing the documents prior to Keith signing anything.

The sale closed on December 29, 1979. Froerer was not present at the closing, but later obtained B–H's signature on the real estate contract and the down payment, and forwarded funds to the Combes and the Bank. Froerer withdrew payment for his fees for drafting the contracts, and for fees for a title search and policy, from the sale proceeds. An escrow account was never established and no preliminary title report was requested or issued prior to the closing of the sale. Keith Combe, in deposition, testified that he first learned that Froerer was going to issue title insurance at the closing. According to Froerer, the title search was probably started before the closing. The title policy was, however, not issued until November 14, 1980. The policy failed to make an exception for the pipeline easement. The underwriter on the policy issued by Froerer was ATGF. At the time, Froerer owned stock in ATGF and regularly researched titles and wrote title insurance for the company.

After the real estate contract was signed, GBE added sewers and utilities to the subdivision layout. GBE completed the final plat in January 1980, which placed a roadway over the pipeline. In 1980, after a proposed sale of the property to a third party failed to materialize, the developers continued to develop their plans for the property, which consisted primarily of obtaining governmental approval for the subdivision. Most of the development work was done by Nielson, Bruce, and Keil.

On November 24, 1982, an amendment was executed by the parties, that gave the developers an additional two years to pay the principal balance of the purchase price. A second amendment was executed on January 3, 1983. This amendment deferred for six months payment of one-half of the $35,000 interest payment which had been due at the end of 1982.

In the spring of 1983, in the process of negotiating a concession for himself in the contract, Keith Combe visited Nielson's office, bringing a new title report with him. The report disclosed several easements that had not been disclosed on the title report issued by Froerer, including the

pipeline easement. Breuer, Harrison, Nielson, Brian, and Keil all testified that this was the first time they had heard of the pipeline easement.[2]

Anderson testified in deposition that after the disclosure of the pipeline easement on the Combe title report, he discovered and communicated to Nielson that Weber Basin was more rigorously enforcing its pipeline easements. Anderson further testified that had he known in 1979 of a thirty-foot easement and the restrictions that are now enforced, he would have advised Keil that the property would be difficult to develop, the cost would be high, and that Keil should look for another piece of ground.

According to Anderson's testimony, the existence of the thirty-foot easement and its enforced restrictions prohibit developing the property. Apparently, Breuer and Harrison wanted to get out of the project after learning of the easement, but Nielson convinced them to continue developing ideas to work around the easement. Bingham Engineering explored and platted the concept of developing the property as a condominium project. According to Breuer and Nielson, the placement of houses over the easement would create special problems if a developer wanted to cross the easement with utilities; hamper efforts in gaining approval to dig around the pipeline; place restrictions on the backfill over the pipeline; require the property owner to make repairs to the pipeline; render fifteen feet of the property on either side of the pipeline unusable for anything except vegetation; and will likely require special bridging or a concrete cover to be placed over any portion of the pipeline that sits within a street.

Following disclosure of the easement in the new title report, Harrison, Breuer, and Nielson contacted Froerer to determine what he and ATGF intended to do to resolve the problem. Nielson also met with Keith Combe several times following the pipeline easement disclosure. Although Keith Combe was generally aware of the problems the easement presented, he opined that it was Froerer's problem and not his. Nielson never told Keith that the development would not proceed because of the easement.

In late 1983 or early 1984, the developers hired a new engineering firm, Bingham Engineering, to obtain "fresh ideas." The complete impact of the easement on the project was not known until Bingham Engineering had completed much of its work and the cost of continuing the project became prohibitive, particularly in light of disclosures about the width of the right-of-way and the depth of the pipeline.

Two additional amendments were executed between the parties in February 1984. The first stated that at least fifteen acres of the property would be developed as condominiums and partial payments would be made to the Combes as each unit was sold. Further, the Combes were required to subordinate their interest in part of the property so that the developers could obtain a construction loan. The second amendment further extended the final payment under the contract until December 31, 1988, if the developers had paid at least $120,000 in principal by the end of 1985.

In August 1984, Breuer and Harrison flew to Utah and for the first time personally met with Keith Combe and raised the option of rescinding the contract. Keith Combe refused to reduce the purchase price of the property to reflect its diminished value because of the easement. Shortly thereafter, B-H filed suit, seeking to rescind the contract and collect the money paid to the Combes on the contract.

The Combes filed cross claims against Froerer and ATGF. In their first cause of action, they sought damages against Froerer based upon his negligence as an attor-

---

**2.** The parties dispute as to when the Combes first learned of the pipeline easement. Breuer, Harrison, and Keil all testified that at their meeting with Keith Combe in August 1984, Keith Combe mentioned to them that he recalled his father telling him about the pipeline. Keith Combe testified in deposition, however, that he never knew there was a pipeline on the property prior to its disclosure in the 1983 title report. In trial, Keith Combe admitted recalling his father talking about the water conservancy district filing a condemnation action to take a portion of the property for an aqueduct easement.

ney; in their second cause of action, they sought damages against Froerer and ATGF based upon the issuance of the title insurance policy.

The trial court granted B–H's summary judgment motion against the Combes, ruling that the Combes had committed anticipatory breach of the warranties of title in the real estate contract. The trial court later granted summary judgment against the Combes dismissing their claims against Froerer and ATGF. A trial was held but was limited to determining the amount of restitution to be received by B–H from the Combes. On the day before trial, the trial court bifurcated B–H's claims against Froerer and ATGF, over the Combes' objection. The jury which was empanelled in an advisory capacity, was discharged, and the trial court in a directed verdict determined the restitutionary damages against the Combes. The Combes, including Keith's brother, Clair, were required to refund B–H $236,966.21, plus pay $133,192.64 in prejudgment interest. The court credited the Combes $7,500 for the fair rental value of the property as agricultural property.

On appeal, the Combes argue that the trial court erred in (1) awarding B–H summary judgment on their rescission claims; (2) summarily disposing of the Combes' cross claims against Froerer and ATGF; (3) ordering that B–H's damage claims against Froerer and ATGF be severed from B–H's claims for restitutionary damages against the Combes; and (4) calculating restitutionary damages and offsets.

The standard of review when considering a challenge to summary judgment is well settled. "A grant of summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Ceco v. Concrete Specialists, Inc.,* 772 P.2d 967, 969 (Utah 1989); *see also* Utah R.Civ.P. 56(c). We construe the facts and view the evidence in the light most favorable to the losing party. *Geneva Pipe Co. v. S & H Ins. Co.,* 714 P.2d 648, 649 (Utah 1986); *Whatcott v. Whatcott,* 790 P.2d 578, 580 (Utah Ct.App.1990). Further, when reviewing conclusions of law on a challenge

to summary judgment, we review those conclusions for correctness, according no deference to the trial court's legal conclusions. *Ceco,* 772 P.2d at 969; *Bonham v. Morgan,* 788 P.2d 497, 499 (Utah 1989) (per curiam).

## SUMMARY JUDGMENT: BREUER–HARRISON

Utah Code Ann. § 57–1–12 (1990) specifies the effect of a warranty deed as follows:

> Such deed when executed as required by law shall have the effect of a conveyance in fee simple ... with covenants from the grantor ... that the premises are free from all encumbrances.... Any exceptions to such covenants may be briefly inserted in such deed following the description of the land.

"An 'encumbrance,' as used in this section, is any right that a third party holds in land which constitutes a burden or limitation upon the rights of the fee title holder." *Bergstrom v. Moore,* 677 P.2d 1123, 1124 (Utah 1984). The Combes concede that the pipeline easement is irremediable. "A defect which, by its nature cannot be removed by the seller as a practical matter is one 'of such a nature that the vendor neither has title nor in a practical sense any prospect of acquiring it.'" *Neves v. Wright,* 638 P.2d 1195, 1199 (Utah 1981) (quoting *Davis v. Dean Vincent, Inc.,* 255 Or. 233, 465 P.2d 702, 706 (1970)). Thus, there is no question that the pipeline easement in this case constitutes a substantial encumbrance on the fee title to the property within the meaning of the statute. *See Bergstrom,* 677 P.2d at 1125 n. 1 (one of the three easements constituting encumbrances was a thirty-foot easement traversing the property in favor of the Weber Basin Water Conservancy District, beneath which lay a thirty-six inch water line); *see also Thackeray v. Knight,* 57 Utah 21, 192 P. 263, 265 (1920) (an easement for a pipeline over the premises is an encumbrance).

██ It is well settled that an action may be maintained for breach of contract based upon the anticipatory repudiation by one of the parties to the contract. *Hur-*

*witz v. David K. Richards Co.*, 20 Utah 2d 232, 436 P.2d 794, 796 (1968). An anticipatory breach occurs when a party to an executory contract manifests a positive and unequivocal intent to not render its promised performance when the time fixed for it in the contract arrives. *Id.* The trial court determined that because the Combes could not convey unencumbered fee title to the property to B–H as required by the real estate contract, the Combes were guilty of anticipatory breach of the contract. We agree. Notwithstanding that no breach of the covenant against encumbrances will occur until the deed is actually delivered,[3] it plainly appears that because of the pipeline easement the Combes would not be able to perform their contract, constituting an anticipatory repudiation of the real estate contract.

The trial court correctly determined that rescission was the appropriate remedy for B–H. The Utah Supreme Court has clearly established that where an unexcepted encumbrance on a seller's title is irremediable and, as a consequence, the seller will not be able to fulfill its contract to convey title as described in the warranty deed, rescission is an appropriate remedy. *Bergstrom*, 677 P.2d at 1125; *Neves*, 638 P.2d at 1199; *Thackeray*, 192 P. at 266.[4]

### 1. *Waiver*

The Combes contend, however, that the trial court erred in granting summary judgment since a key unresolved factual dispute in this case is when B–H learned of the pipeline and easement. The Combes argue that viewed in the light most favorable to them, the record establishes that B–H or their local partners, Keil, Nielson, and Brian, knew of the pipeline and easement before they executed the contract with the Combes, since the drawings prepared by B–H's engineers showed the pipeline and easement. The Combes cite the trial court's acknowledgement in its order granting summary judgment that "[t]here is a dispute of fact as to the exact date at which the buyers became aware of the existence of the easement and became aware of the existence of the aquaduct [sic]." The Combes conclude if B–H knew or had notice of the pipeline and easement prior to execution of the real estate contract, it waived any rights of rescission for anticipatory breach of contract. *See generally Callister v. Millstream Assocs., Inc.*, 738 P.2d 662, 664 n. 6 (Utah Ct.App.1987); 77 Am.Jur.2d *Vendor & Purchaser* § 120 (1975) (the rule that a vendee's notice of encumbrances upon the property does not relieve the vendor of the duty of removing the encumbrance, where he or she contracts to convey free of all encumbrances, applies only to removable encumbrances, not to unremovable encumbrances, such as building restrictions or restrictions on the use of the property).

Viewing the evidence in a light most favorable to the Combes, however, we find no genuine issue of material fact with regard to when Breuer and Harrison and their local partners learned of the pipeline and easement. The testimony of Breuer, Harrison, Nielson, and Bruce all clearly establish that they did not know of the pipeline or the easement until sometime in 1983. Keil was aware of what he termed a "waterline" prior to the execution of the real estate contract, but considered it only a minor impediment to the development of the property for housing units. Keil testified that he never disclosed the waterline to Breuer or Harrison and that he also did not learn of the easement until 1983. Even

---

**3.** Generally, a vendor is allowed a reasonable time to perfect title. *Callister v. Millstream Assocs., Inc.*, 738 P.2d 662, 664 n. 5 (Utah Ct.App. 1987).

**4.** Where there is an anticipatory repudiation, rescission of the contract is one of three options available to the non-breaching party in common law as well as under Utah law. The Utah Supreme Court has articulated these three options as follows:

1. Treat the entire contract as broken and sue for damages.
2. Treat the contract as still binding and wait until the time arrived for its performance and at such time bring an action on the contract.
3. Rescind the contract and sue for money paid or for value of the services or property furnished.

*Hurwitz v. David K. Richards Co.*, 20 Utah 2d 232, 436 P.2d 794, 796 (1968).

after exhaustive discovery and deposition testimony, the evidence does not contradict or cast any doubt on the developers' testimony. Breuer and Harrison walked across the property but, according to Anderson, neither the pipeline nor any physical manifestations of the pipeline were visible to the eye. Although "Aqueduct" was marked on the base sheet prepared by Olsen, there was no plat map or sketch created by GBE prior to 1983 that disclosed the existence of an easement. There is no evidence that prior to executing the contract, Breuer or Harrison saw the base sheet or any sketches traced from the base sheet showing the pipeline. Anderson's and Olsen's testimony reinforce our conclusion that GBE did not fully appreciate the ramifications of the pipeline easement and never communicated to B–H the existence of a pipeline easement. Admittedly, the trial court found in dispute the exact date that B–H learned of the pipeline easement. However, because B–H clearly did not learn of the easement until well after the execution of the contract, this dispute does not involve a material fact. Because there is no genuine issue of material fact that B–H lacked knowledge of the pipeline on or before December 31, 1979, we find that it did not waive any rights to title without encumbrances when it executed the contract with the Combes.

█ Even if B–H had knowledge of the irremediable easement or, as the dissent postulates, constructive notice under Utah Code Ann. § 57–3–2 (1990), the Combes would still be subject to the statutory covenant against encumbrances under section 57–1–12. In *Bergstrom v. Moore*, 677 P.2d 1123 (Utah 1984), the Utah Supreme Court noted that the unexcepted encumbrances on appellants' title, which included, as in this case, the Weber Basin waterline easement, which presumably was duly recorded, were irremediable. Although the supreme court found that it was undisputed that respondent had no knowledge or notice of at least one of the easements, the court stated that "[e]ven if respondent knew of some of the easements (as claimed by appellants), mere knowledge of encumbrances of this nature would not be suffi-

cient to exclude them from the operation of the statutory covenant against encumbrances." *Id.* at 1125.

█ The Combes assert, however, that even if the developers did not learn of the pipeline and easement until 1983, their five-year delay in asserting rescission for the Combes' anticipatory breach raised additional factual issues of waiver that could not be resolved by summary judgment. The Combes contend that during this five-year period, B–H reaffirmed its commitment to the contract by (1) paying annual interest payments, (2) hiring a new engineering firm to explore fresh ideas of developing the property, and (3) Nielson telling Keith Combe that B–H would hold only ATGF and Froerer liable for the breach and would honor the terms of the contract.

An original feature of the English doctrine of anticipatory breach was that a party continuing performance in the face of an anticipatory repudiation thereby waives the repudiation and can only sue on a subsequent breach, if any, occurring at the time when performance is due. 4 *Corbin on Contracts* § 981 (1951). The modern rule, however, "is that an innocent party, confronted with an anticipatory repudiation, may continue to treat the contract as operable and urge performance by the repudiating party without waiving any right to sue for that repudiation." *United California Bank v. Prudential Ins. Co., Etc.*, 140 Ariz. 238, 681 P.2d 390, 433 (Ct.App. 1983); *see, e.g., Upland Indus. Corp. v. Pacific Gamble Robinson Co.*, 684 P.2d 638, 643 (Utah 1984); *see also* 4 *Corbin* § 981 at 938–39.

The basis for the modern rule, as the Combes point out in their reply brief, is to give the breaching party the opportunity to cure the breach before the time for performance is due. A party that has received a definite repudiation from the breaching party to the contract should not be penalized for its efforts to encourage the breaching party to perform its end of the bargain. *United California Bank*, 681 P.2d at 433. The repudiating party has a power of retraction as long as there has been no sub-

stantial change of position by the injured party and the nonbreaching party's continuing to urge performance may be properly held to keep this power of retraction alive. 4 *Corbin* § 981 at 939.

The Combes contend that the rationale for the modern approach to anticipatory breach of contracts is inapplicable to the rescission remedy as used in this case. Because the easement is incurable and they are unable to perform their end of the bargain, the Combes assert that there was no legal or rational basis to allow B–H to stall in rescinding the contract until the contract became unprofitable. In sum, the Combes argue that the executory real estate contract became no different than one on which performance had become due at the moment that B–H discovered the easement. At that point, B–H should have made an election, which they in effect did, argue the Combes, by affirming the contract.

The Combes' argument that the nonbreaching party, in appropriate circumstances, ought to rescind without delay, in order to be able to mitigate damages, is admittedly persuasive. *See University Club v. Invesco Holding Corp.*, 29 Utah 2d 1, 504 P.2d 29, 30 (1972) ("where one party definitely indicates that he cannot or will not perform a condition of a contract, the other is not required to uselessly abide time, but may act upon the breached condition. Indeed in appropriate circumstances he ought to do so to mitigate damages."). However, even though the pipeline easement was incurable, the circumstances in this case did not demand immediate rescission of the contract by B–H. The complete impact of the pipeline easement was not known until further engineering work was completed and the development cost of the property became prohibitive in light of the pipeline easement. Further, although a plummeting real estate market may have precipitated B–H's decision to rescind the contract, contrary to the Combes' representations, the record is clear that B–H did not just sit on its rights following the disclosure of the easement. B–H, through the efforts of Nielson, appropriately sought ways to mitigate the damage caused by the

pipeline by attempting to develop the property in other ways. Although in hindsight, B–H would have saved both parties considerable expense had it rescinded the contract immediately upon disclosure of the easement, it is sound policy to not blindly require a non-breaching party to rescind immediately upon discovering the anticipatory breach. Even where the breach cannot be repaired, a non-breaching party may appropriately attempt in good faith to mitigate damages by attempting to honor the contract and work around problems presented by the breach.

### 2. *Estoppel/Laches*

■ The Combes also contend that B–H's delay in exercising its rescission rights raised material factual issues of estoppel and laches. not properly resolved by summary judgment. The Combes assert that only when real estate values plummeted in 1987, did B–H seek rescission. This delay, posit the Combes, precluded them from reselling the property, prior to the decline in property values, for an amount that would have made all parties whole.

We have stated that

> [b]efore *equitable estoppel* may be applied, three elements must be present: 1) an admission, statement, or act inconsistent with the claim afterwards asserted; 2) action by the other party on the faith of such admission, statement, or act; and 3) injury to such party resulting from allowing the first party to contradict or repudiate such admission, statement, or act. Successful assertion of *laches* requires defendant to establish that plaintiff unreasonably delayed in bringing an action and that defendant was prejudiced by that delay.

*Utah Dep't of Transp. v. Reagan Outdoor Advertising, Inc.*, 751 P.2d 270, 271 (Utah Ct.App.1988) (citation omitted) (emphasis added).

We find that the Combes failed to demonstrate a factual dispute regarding the first element of estoppel: i.e., an admission, statement, or act inconsistent with the claim afterwards asserted. Contrary to

the Combes' representation, we do not find anything in the record of the summary judgment proceeding suggesting that Nielson told Keith Combe that they would look only to the title company and Froerer for any liability for the pipeline and that B–H would honor the terms of the contract even with the easement. As we have stated, B–H's delay in exercising its rescission rights was due to its efforts to mitigate damages due to the pipeline and easement, not because they were relinquishing their later-asserted claim of rescission. Further, since the delay was a reasonable attempt to work around the easement, we reject the Combes' laches claim.

### 3. *Contractual ambiguities*

■ The Combes also argue that the trial court improperly resolved factual issues created by ambiguities in the real estate contract concerning the scope of warranties of title given by the Combes. The Combes assert that if the unnamed escrow agent, in accordance with paragraph four of the real estate contract, was to convey title by special warranty deed to B–H, such would not cover the pipeline easement created before the Combes took title. This argument is meritless since the Combes are clearly obligated under the real estate contract to provide a deed with no encumbrances on the property and a special warranty deed could not obviate that requirement. The Combes also contend that the warranties of title in paragraph eight conflict with the disclaimer of all warranties in paragraph five. We find, however, that the "as is" provisions contained in paragraph five relate to the physical condition of the property and have nothing to do with warranties of title as set forth in paragraph eight of the real estate contract.

### SUMMARY JUDGMENT: MALPRACTICE CLAIM AGAINST FROERER

We next turn to the Combes' argument that factual issues also barred the summary judgment dismissing the Combes' cross claims against Froerer. The Combes contend that Froerer committed legal malprac-tice by 1) failing to complete the title work prior to the real estate closing; 2) withholding material information from the Combes; and 3) by simultaneously representing another client with conflicting interests.

■ Traditionally, in a legal malpractice action, the threshold question is whether an attorney-client relationship was established. *Bergman v. New England Ins. Co.*, 872 F.2d 672, 674 (5th Cir.1989); *Guillebeau v. Jenkins*, 182 Ga.App. 225, 355 S.E.2d 453, 456 (1987). Once this relationship is proven, the client has the burden of showing two additional elements: 1) negligence on the part of the attorney, and 2) that such negligence was the proximate cause of damage to the client. *See, e.g., Dunn v. McKay, Burton, McMurray & Thurman*, 584 P.2d 894, 896 (Utah 1978); *see also Bergman*, 872 F.2d at 674; *Guillebeau*, 355 S.E.2d at 456.

■ In general, except where an attorney is appointed by a court, the attorney-client relationship is created by contract. *Franko v. Mitchell*, 158 Ariz. 391, 762 P.2d 1345, 1351 (Ct.App.1988); *Fox v. Pollack*, 181 Cal.App.3d 954, 226 Cal.Rptr. 532, 534 (1986). The contract may be express or implied from the conduct of the parties. *Margulies by Margulies v. Upchurch*, 696 P.2d 1195, 1200 (Utah 1985). The relationship is proved by showing that the party seeks and receives the advice of the lawyer in matters pertinent to the lawyer's profession. *People v. Morley*, 725 P.2d 510, 517 (Colo.1986) (en banc); *Steinbach v. Meyer*, 412 N.W.2d 917, 918 (Iowa Ct.App.1987). Such a showing is subjective in that a factor in evaluating the relationship is whether the client thought an attorney-client relationship existed. *Matter of Lieber*, 442 A.2d 153, 156 (D.C.1982); *Matter of Petrie*, 154 Ariz. 295, 742 P.2d 796, 801 (1987) (en banc); *Louisiana State Bar Ass'n v. Bosworth*, 481 So.2d 567, 571 (La. 1986). However, a party's belief that an attorney-client relationship exists, unless reasonably induced by representations or conduct of the attorney, is not sufficient to create a confidential attorney-client relationship. *Fox*, 226 Cal.Rptr. at 535; *see also Guillebeau*, 355 S.E.2d at 458 ("An

attorney-client relationship cannot be created unilaterally in the mind of a would-be client; a reasonable belief is required."). In sum, "[i]t is the intent and conduct of the parties which is critical to the formation of the attorney-client relationship." *Hecht v. Superior Court,* 192 Cal.App.3d 560, 237 Cal.Rptr. 528, 531 (1987).

The Combes assert that Froerer understood that he had been hired by them to perform several tasks, including 1) the drafting of all documents for the transfer of parcels among the Combe siblings, 2) the drafting of preliminary and final real estate contracts with B–H, 3) conducting a title search, and 4) procuring the title insurance policy. Keith Combe testified in deposition that he always assumed Froerer was his attorney since he was going to be paying him money. Froerer did in fact pay his fees from the funds delivered to him in payment of the purchase price due to the Combes.

Froerer claims, however, that he represented the buyers solely, not the Combes. He counters that merely because he was paid out of the proceeds of the sale does not establish an attorney-client relationship. He argues that such practice is common in real estate transactions and that the argument could be made that the sale proceeds were actually paid by B–H since they were the ones who deposited the money for closing.[5]

■ Although payment for legal services may be persuasive evidence that an attorney-client relationship was established, *Foulke v. Knuck,* 162 Ariz. 517, 784 P.2d 723, 726 (Ct.App.1989), there are exceptions. *See, e.g., Guillebeau,* 355 S.E.2d at 457 (where party obligated herself to pay closing costs before anyone contacted attorney, she did not pay attorney's fee in the furtherance of a contract of legal employment and, therefore, no attorney-client relationship existed). However, the payment

of attorney fees does not by itself determine whether an attorney-client relationship exists, but is only one indicia. *Hecht,* 237 Cal.Rptr. at 530; *see also Huddleston v. State,* 259 Ga. 45, 376 S.E.2d 683, 684 (1989) (although the general test of employment is the fee, the basic question with regard to an attorney-client relationship is whether advice or assistance of the attorney is both sought and received).

■ In reviewing summary judgment, we must view the evidence in a light most favorable to the Combes, the party opposing summary judgment. *Salt Lake City Corp. v. James Constructors,* 761 P.2d 42, 45 (Utah Ct.App.1988). Evidence presented to the court on this issue consisted mostly of deposition testimony. Keith Combe testified in deposition that he perceived the transaction of property trades between himself and his siblings as part of the sale to B–H and that he was not aware that Froerer was going to issue title insurance until at the closing when he learned that Froerer would perform the task at the request of Keil. The record further shows that the Combes had no prior contact with Froerer, they at no time sought Froerer's legal advice either before or after the closing, and Froerer was not present at the closing. Also, Keith Combe requested that another attorney, Kunz, review and make necessary changes in the preliminary documents that Froerer drafted. Evidence supporting existence of an attorney-client relationship consists of Keith Combe's testimony that he thought Froerer was acting as his attorney; the type of documents prepared, including the transfers among the Combe siblings; and Froerer's payment from the sale proceeds at closing. Viewing this evidence in a light most favorable to the Combes, we cannot say that there is no genuine issue of material fact entitling Froerer to summary judgment. It is only necessary for the nonmoving party to show

---

5. Froerer also claims that the Combes' claims against him are barred by the four year statute of limitations under Utah Code Ann. § 78–12–25 (1987). Since this issue was not presented first to the trial court for its consideration and resolution, we will not consider it. *See State v. Webb,* 790 P.2d 65, 71 (Utah Ct.App.1990). Further, we note that a cause of action for legal malpractice accrues, and the four-year limitation commences to run, when the act complained of is discovered or, in the exercise of reasonable care, should have been discovered. *Merkley v. Beaslin,* 778 P.2d 16, 19 (Utah Ct.App. 1989).

"facts" controverting the "facts" asserted by the moving party. *Id.* We, therefore, reverse and remand on the factual issue of whether an attorney-client relationship existed between Froerer and the Combes. When that fundamental factual issue is determined, the trial court can proceed accordingly with respect to this transaction.

## SUMMARY JUDGMENT: CONTRACTUAL & ABSTRACTOR NEGLIGENCE CLAIMS AGAINST FROERER & ATGF

The Combes next argue that schedule A of the title insurance policy insures their interests as well as those of B–H, or was at least ambiguous on this point, rendering the intent of the parties a question of material fact. Schedule A states, in pertinent part:

1. The estate or interest in the land described herein and which is covered by this policy is: An interest pursuant to that certain Uniform Real Estate Contract dated January 9, 1980, by and between KEITH P. COMBE and EVELYN, his wife, and FIRST SECURITY BANK N.A., Trustee, as Seller, and CASPER J. BREUER, and WILLIAM M. HARRISON, as Buyer.

2. The estate or interest referred to herein is at Date of Policy vested in:

Parcels # 1 thru # 4: Keith P. Combe and Evelyn Combe

Parcel # 5: First Security Bank N.A., Trustee, and Keith P. Combe and Evelyn.

The Combes contend that paragraph one refers to the Combes' interest, as well as to B–H's interest, since the Combes retained legal title to the property. If the policy were intended to insure only B–H, argue the Combes, paragraph one should have referred only to the "equitable estate" created by the real estate contract. The Combes also assert that the language in paragraph two, "estate or interest referred to herein" includes the Combes and fails to clearly state that B–H's interest only was insured.

"Title insurance is a contract to indemnify the insured against loss through defects in the insured title or against liens or encumbrances that may affect the insured title at the time the policy is issued." *Malinak v. Safeco Title Ins. Co. of Idaho,* 203 Mont. 69, 661 P.2d 12, 14 (1983). The determination of whether a contract is ambiguous is a question of law. *Regional Sales Agency, Inc. v. Reichert,* 784 P.2d 1210, 1213 (Utah Ct.App.1989). Thus, as we previously noted, we accord the trial court's interpretation no particular weight, reviewing its interpretation under a correction-of-error standard. The mere fact that the parties disagree as to the meaning of the language contained in the policy is not sufficient to create an ambiguity. *B.F. Goodrich Co. v. Vinyltech Corp.,* 711 F.Supp. 1513, 1517 (D.Ariz.1989). The first step in our review is to examine the document in its entirety and in accordance with its purpose, giving effect to all of its parts. *Larrabee v. Royal Dairy Prods. Co.,* 614 P.2d 160, 163 (Utah 1980); *Regional Sales Agency, Inc.,* 784 P.2d at 1213.

Following careful review of the title insurance policy issued by ATGF, we determine that the Combes' assertions are without merit. The policy clearly insures solely B–H, not the Combes. The title insurance policy is described throughout as the "owners" policy. An executory contract of sale converts the interest of the vendor of the real property to personalty. *Willson v. State Tax Comm'n,* 28 Utah 2d 197, 499 P.2d 1298, 1300 (1972); *Cannefax v. Clement,* 786 P.2d 1377, 1379–80 (Utah Ct.App.1990). The vendee acquires the equitable interest in the property at the moment the contract is created and is treated as the owner of the land. *Cannefax,* 786 P.2d at 1380; *Lach v. Deseret Bank,* 746 P.2d 802, 805 (Utah Ct.App.1987). Thus, viewing the policy in its entirety, we find the document's purpose clear: to provide title insurance for the owners of the property, Breuer and Harrison. Therefore, the trial court properly granted summary judgment for ATGF and Froerer on the Combes' claim under the title policy.

The Combes also contend that factual issues precluded summary judgment of their claim against Froerer and ATGF for

abstractor's negligence. Some jurisdictions have held that a title insurance company has the liability of an abstractor of title when it inspects records and prepares title reports. *Culp Construction Co. v. Buildmart Mall*, 795 P.2d 650, 653 n. 3 (Utah 1990); *Moore v. Title Ins. Co. of Minnesota*, 148 Ariz. 408, 714 P.2d 1303, 1306 (Ct.App.1985); *see, e.g., White v. Western Title Ins. Co.*, 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309, 315 (1985); *Malinak v. Safeco Title Ins. Co. of Idaho*, 203 Mont. 69, 661 P.2d 12, 14–15 (1983); *but see Anderson v. Title Ins. Co.*, 103 Idaho 875, 655 P.2d 82 (1982). However, the Utah Supreme Court recently adopted the "better-reasoned approach" which views preliminary title reports and title insurance commitments as " 'no more than a statement of the terms and conditions upon which the insurer is willing to issue its title policy....' " *Culp Constr.*, 795 P.2d at 653 (quoting *Lawrence v. Chicago Title Ins. Co.*, 192 Cal.App.3d 70, 237 Cal.Rptr. 264, 268 (1987)).

Although the Utah Supreme Court has not directly addressed the issue of tort liability for abstractor negligence, *but cf. Culp Constr.* at 654–655; *Bush v. Coult*, 594 P.2d 865, 867 (Utah 1979) (title insurance is in the nature of a warranty), the tort of negligent misrepresentation against third parties to a real estate transaction is clearly recognized by the court. *See Christenson v. Commonwealth Land Title Ins. Co.*, 666 P.2d 302, 305 (Utah 1983). In *Christenson*, the supreme court defined negligent misrepresentation as follows:

> Where (1) one having a pecuniary interest in a transaction, (2) is in a superior position to know material facts, and (3) carelessly or negligently makes a false representation concerning them, (4) expecting the other party to rely and act thereon, and (5) the other party reasonably does so and (6) suffers loss in that transaction, the representor can be held

responsible if the other elements of fraud are also present.

*Id.*[6] (quoting *Jardine v. Brunswick Corp.*, 18 Utah 2d 378, 423 P.2d 659, 662 (1967)).

■ In *Culp Construction*, the supreme court held that a title insurance policy does not constitute a representation of title, but only acts to insure the described title. Since in this case no preliminary report was requested or issued and the title policy was not issued until after closing, the Combes did not rely upon ATGF's alleged representations. The Combes counter that Froerer's actions led the Combes to believe that he had already conducted the title search and issued the title policy, and that they had clear, marketable title to the property. This representation, however, is unsupported by the record. Following careful review, we find that since the Combes did not know or even anticipate that Froerer and ATGF were going to issue title insurance until the time of closing, they did not rely on any representation by Froerer or ATGF that a preliminary report had been issued.

## BIFURCATION OF TRIAL

■ The Combes next contend that because the bifurcation of the trial was prejudicial to them, it was an abuse of discretion. "Severance is within the sound discretion of the trial court and, absent abuse of such discretion, will not be upset on appeal." *King v. Barron*, 770 P.2d 975, 976 (Utah 1988); *see also* Utah R.Civ.P. 21, 42(b). The parties stipulated to the amount paid by B–H and the trial court received the stipulation as binding upon the parties. Consequently, there was only one issue left to be tried: the amount of restitution to be paid as determined from the fair market value of the property. Since the Combes' claims against Froerer and ATGF were irrelevant to the issue of the fair market rental value of the property, the trial court did not abuse its discretion in bifurcating

---

**6.** The Utah Supreme Court in *Christenson* determined that a title insurance company's acknowledgment of a document that incorrectly indicated that certain properties held in escrow had unencumbered equity values available as security for plaintiff amounted to negligent misrepre-

sentation. This case is distinguishable from *Christenson*. ATGF does not purport to act as anything other than a title insurance company, whereas the title insurance company in *Christenson* had assumed additional duties as an escrow agent.

the claims and cross-claims between the appellees and ordering separate trials.

## CALCULATION OF RESTITUTIONARY DAMAGES

We next address the court's verdict on restitutionary damages. The Combes claim the trial court erred in concluding that the fair rental value of the property had no relationship to its fair market value at its highest and best use. The trial court determined that the highest and best use of the property in its then present condition was for agricultural purposes and, therefore, credited the Combes with yearly rent of $1500. Citing *Warner v. Rasmussen*, 704 P.2d 559, 562 (Utah 1985), the Combes insist that, as a matter of law, fair rental value equals a reasonable return on the market value of the property as established by the contract price, and is calculated as the annual interest due on the unpaid balance of the contract, at the contract rate. According to the Combes' expert witness testimony, such calculation would bring a reasonable rate of return of $49,350 per year.

 The supreme court in *Warner* was addressing the trial court's determination of seller's damages for buyer's breach of an installment contract, as measured, in part, by the fair rental value of the property during the period of occupancy. The goal in *Warner* in awarding the seller damages for loss of use of the property was to grant a reasonable return on the investment. *Id.* This case, in contrast to *Warner,* involves the buyer's election of rescission for seller's breach of a land purchase contract. Rescission is a restitutionary remedy which attempts to restore the parties to the status quo to the extent possible or as demanded by the equities in the case. *Dugan v. Jones,* 724 P.2d 955, 957 (Utah 1986); *see also Potter v. Oster,* 426 N.W.2d 148, 151 (Iowa 1988). "In the

case of a rescission, the buyers are entitled to be returned to the status quo and to recover the payments made on the contract, less the fair rental value of the premises for the time they had possession thereof." *Dugan,* 724 P.2d at 957.

 We find that the trial court correctly determined that the expected rate of return on an investment was an inapplicable measurement in determining the fair rental value of the property for the time B–H had possession. That methodology would preclude restoring the parties to their positions at the time the contract was executed and would provide the Combes with a windfall. We also find that since the use of the property for residential purposes is prohibited by the pipeline easement problems and it was not so used during the contract term, the trial court reasonably determined that the highest and best use of the property in question in its then present condition was for agricultural purposes. That determination was amply supported by the evidence and testimony of B–H's expert witness.

 We also reject the Combes' argument that the award of prejudgment interest is improper because B–H delayed in exercising its rescission rights. *See Nielson v. Droubay,* 652 P.2d 1293, 1297 (Utah 1982) (a prevailing party who delays proceedings may not be awarded prejudgment interest). As we have previously noted, any delay was not unreasonable.

 Finally, we agree with the Combes' assertion that the trial court miscalculated the rate of prejudgment interest at ten per cent, in violation of Utah Code Ann. § 15-1-1 (1986).[7] The contract was executed prior to 1981 and therefore, prejudgment interest should accrue at six per cent per annum, not ten per cent. *SCM Land Co. v. Watkins & Faber,* 732 P.2d 105, 109

---

7. Section 15-1-1 states in pertinent part:
 (1) Except when parties to a lawful contract agree on a specified rate of interest, the legal rate of interest for the loan or forebearance of any money, goods, or chose in action shall be 10% per annum. Nothing in this section may be construed to in any way affect any penalty

or interest charge which by law applies to delinquent or other taxes or to any contract or obligations made before May 14, 1981.
The Combes point out that the statutory interest rate in effect at the time the contract was executed was at six percent. Utah Code Ann. § 15-1-1 (1953).

(Utah 1986). B–H has provided us with no arguments to the contrary. Therefore, we remand for a determination of the prejudgment interest amount.

## CONCLUSION

In conclusion, we affirm the trial court's granting of summary judgment to B–H on its rescission claim against the Combes. We also affirm the trial court's determination of the fair market rental value of the property and the propriety of awarding prejudgment interest. However, we reverse and remand for recalculation of the prejudgment interest amount at six per cent per annum instead of ten per cent. We also reverse and remand on the issue of whether an attorney-client relationship existed between Froerer and the Combes. If such a relationship is found, the Combes may proceed with their legal malpractice claim. We affirm the trial court's summary judgment for Froerer and ATGF on the contractual and abstractor negligence claims and the court's bifurcation of claims against Froerer and ATGF.[8]

JACKSON, J., concurs.

ORME, Judge (concurring in the result in part, dissenting in part, and concurring in part):

B–H apparently lacked actual notice at least of the *extent* of the waterline easement until well after the purchase agreement was entered into. Nonetheless, the easement appeared of record and thus B–H "is properly charged with constructive notice" of the easement. *Callister v. Millstream Assocs., Inc.*, 738 P.2d 662, 663 n. 3 (Utah Ct.App.1987); Utah Code Ann. § 57–3–2(1) (1990).

In *Callister*, which concerned a similar contractual provision to the effect that title would be conveyed free of all liens and encumbrances, with no provision made to exempt easements of record or particular classes of easements, we held that the buyer's constructive knowledge of the encumbrance was essentially irrelevant since it nonetheless "had a contractual right to conveyance of title free and clear of all liens...." 738 P.2d at 663. Come closing, the seller was unable to clear a 60–unit restrictive covenant although it succeeded in substituting for it a more advantageous 75–unit restriction. *Id.* at 664. This was not enough. "A 75–unit encumbrance failed to meet the requirements of the contract and provided grounds for rescission, just as the 60–unit encumbrance would have done." *Id.* We accordingly affirmed the judgment granting rescission.

In *Callister*, we were urged to reverse in view of the doctrine "that if the purchaser has notice of encumbrances upon the property, and the encumbrance is of such a nature that it could not be removed by the vendor ... then the purchaser takes possession subject to the encumbrances." *Id.* at 664 n. 6. We held that the authorities relied on by the vendor in *Callister* were distinguishable and did not consider the doctrine further. *See id.* It is noteworthy, however, that the restrictive covenant in *Callister* was not actually "of such a nature that it could not be removed by the vendor." On the contrary, it *was* removed, albeit only on the condition that a different restriction be substituted. But there is nothing to suggest that it could not have been removed altogether, given more successful negotiations with adjacent property owners or others who had to consent to the change.

The Combes raise a similar argument here and it is undisputed—apparently in view of the gross unfeasibility financially and otherwise of rerouting a water district's deeply buried water line and accompanying easement around the subject property—that the easement in question cannot be removed by the Combes. Although somewhat lukewarm to the general notion when I authored *Callister, see* 738 P.2d at 664 n. 6, I am now persuaded it makes good sense. If a purchaser has knowledge of an encumbrance that cannot be removed, and enters into a contract calling for conveyance free and clear, the entire contract is an exercise in futility unless the operative provision be taken to exclude such an encumbrance. Otherwise, the purchaser

---

**8.** We have considered appellees' suggestion of mootness and find it without merit.

has entered into a contract requiring the vendor to do the impossible, which would be nonsensical.

As a matter of vendor-vendee law, the general principle seems to be settled. *See* 77 Am.Jur.2d *Vendor & Purchaser* § 120 (1975). However, the rule is otherwise in Utah where a warranty deed has actually been given and the question about an irremediable encumbrance arises in the context of whether the warranty provided in Utah Code Ann. § 57-3-2 (1990) has been breached. *See Bergstrom v. Moore*, 677 P.2d 1123, 1125 (Utah 1984). For the narrow reason that the contract in this case called for delivery of an unrestricted warranty deed, and it is appropriate to read the statutory warranty into the key contractual provision,[1] I concur that the Combes cannot prevail under their irremediable encumbrance argument.

Nonetheless, I would reverse the summary judgment in favor of B–H. I believe the five-year delay in asserting a rescission right, during which time payments were made and the contract was twice amended, necessarily poses a material question of fact: Even if some time to assess the situation and explore possibilities of mitigation was available to B–H after "discovery" of the easement, was five years more than the "reasonable time" the law would permit in which to do so? On the record before us, I cannot conclude that five years was not an unreasonable delay.

I concur in the court's disposition of who is insured under the title policy, but base my conclusion not so much on the characterization of the term "owner" as on the fact that the purchase agreement anticipated the Combes procuring insurance for B–H and the further fact that when both vendor and purchaser under a real estate contract are intended to be insured under a

"title" policy, both are clearly identified as insureds, typically with the phrase "as their interests may appear."

I concur in the court's opinion insofar as it treats the "abstractor's negligence" claims, the attorney malpractice claim, the bifurcation issue, and the interest issue.

Finally, even assuming the judgment of rescission should otherwise be affirmed, I disagree with the court's view of how to calculate the offset against payments made for B–H's possession of the property for the years between execution of the contract and assertion of a right to rescind, which in my mind leaves B–H with a substantial windfall. I agree with Professor Dobbs, who suggests that in the usual real estate restitution case the buyer's claim to interest on the payments it gets back, and the seller's claim to the fair rental value of the property while it was detained, should be considered a "wash." *See* D. Dobbs, *Remedies* § 12.9 at 846 (1973). This approach would work a much fairer result in this case than valuing B–H's use of the property at agricultural rental rates, not only because the parties' contract fixes a reliable measure of its total value (and thus of an imputed rental value) at a much higher rate, but also because B–H kept the property tied up for so many years during which the Combes were precluded from marketing the property to other buyers. The restitution decreed in this case does not merely make B–H whole; it gives it a hefty profit.

---

1. Stated another way, the Combes would have breached their agreement to deliver an unrestricted warranty deed upon conveying title subject to the easement and it follows they were in anticipatory breach of the contract's requirement for a warranty deed by reason of the easement's existence.